**FILED**

APR - 8 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

[ ...ng

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

JURY DEMAND

| | |
|---|---|
| ROMEO EZIKE | ) |
| Plaintiff | ) |
| v. | ) |
| | ) |
| MR. Lakshmi Mittal | ) |
| Defendant | ) |
| Hoffman Enclosures, Inc., | ) |
| Defendant | ) |
| DHL | ) |
| Defendant | ) |
| City of Chicago | ) |
| Defendant | ) |
| Amtrak | ) |
| Defendant | ) |
| Elgin Mental Health Center | ) |
| Defendant | ) |
| Cook County Jail | ) |
| Defendant | ) |
| Brian Nolan | ) |
| Defendant | ) |
| Kenneth Wadas | ) |
| Defendant | ) |
| Richard Kruss | ) |
| Defendant | ) |
| Julie Shopnitz SW11 | ) |
| Defendant | ) |
| A. Nidea | ) |
| Defendant | ) |
| Romulo Nazareno | ) |
| Defendant | ) |
| Ms. Diana Garcia- Camilo | ) |
| Defendant | ) |
| Teamsters Union | ) |
| Defendant | ) |
| Hargurmukh Singh | ) |
| Defendant | ) |
| Elizabeth Siavon RN Nurse | ) |
| Defendant | ) |
| Northern District Federal | ) |
| Court of Illinois Defendant | ) |
| Defendant | ) |

MEJ

1

1. This Court has Jurisdiction over this Issue because it arises under the Laws of the United States, it is a Constitutional question based on 28 U.S.C. 1345.
2. Venue is appropriate it is a Diversity of Citizenship and a Title 18 U.S.C section 1962c, 1962d, RICO Act, section 4 of the Clayton Act, 15 USC section 15. Plaintiff is requesting it to been assigned to San Francisco or Oakland. (Sedima v Imrex Co. 741 F2d 482, 488-489 nn 18-20 (2d Cir. 1984)(tracing the evolution of RICO Civil Enforcement provision, and noting that the provision was patterned on the Clayton Act) Sedima SPRL v Imrex Co, 473 US 479, 486 (1985). Plaintiff is seeking to recover damages to Business and property in the amount of 25,000,000 million dollars under section 1964c, 1965
3. Plaintiff Romeo Ezike is pro-se (Haines v Kerner, 404 U.S 519, 520, 92 s. Ct. 594, 30 L. Ed. 2d 652 (1972), Richardson v. United States, 338 U.S App. D.C 265, 193 F. 3d 545, 548 (D C Cir. 1999), (Denton v Hernandez, 504 U.S. 25, 33, 112 s. Ct. 1728, 118 L. Ed. 2d 340 (1992), and United States Citizen, College Educated residing in San Francisco, California. Mr. Romeo Ezike has various worked skills, but is disabled and cannot work due to disability he suffered as a result of campaign of harassments that has resulted in injury to business/property and physical injury. (Holmes v. Securities Investor Protection Corp., 503 U.S 258, 112 s. Ct 1311, 117 L. Ed. 2d 532 (1992); Trollinger v Tyson Foods, Inc; 370 F. 3d 602, 2004 Fed. App. 0165p (6th Cir. 2004).

Mr. Lakshmi Mittal: Plaintiff is making the claimed that

4. Mr. Lakshmi Mittal is the RICO person who is liable under RICO 1962c, 1962d and 1964c, and is subject to the Clayton Act section 4, 15 USC section 15. Sedima SPRL v Imrex Co, 473 US 479, 486 (1985).
5. Plaintiff is claiming that Mr. Lakshmi Mittal 's law firm Seyfarth Shaw is the leader of the enterprises that was formed without an economic motive, but to harass, punished, obstruct and retaliate against plaintiff for petitioning the government, and engaging in protected activity in a judicial proceeding. National Organization for women, Inc v Scheidler, 510 US 249, 258 (1994) (holding that congress's use of the word "enterprise" does not lead to "the inference that an economic motive is required") 18 U.S.C section 1963. Plaintiff is claiming that the enterprises have engaged in at lease two prohibited acts as defined in Title 18 U.S.C section 1961. In H. J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 109 S. Ct. 2893, 106 L. Ed. 2d 195 (1989). Plaintiff can satisfy the "continuity" requirement by showing either a "closed period of repeated conduct, or past conduct that by its nature projects into the future with a threat of repletion. "Id at 2902.
6. Plaintiff is claiming that Mr. Lakshmi Mittal is the beneficiary of predicate acts committed by the enterprises, corporation and individuals seeking his interest. "Sixth Circuit theory of "LEGAL Separateness" to conclude that related Corporations, owners, and officers were sufficiently distinct to constitute separate RICO "PERSONS" AND "ENTERPRISES" Fleischhauer v Feltner, 879 F.2d 1290 (6th Cir. 1989), cert. denied, 493 U.S 1074 (1990) Fleischhauer v Feltner, 879 F.2d 1297 enterprise distinct from the defendants. The Sixth Circuit's

Fleischhauer decision holding that a corporation and its owner are sufficiently distinct for RICO person/enterprise purposes is both consistent with the traditional recognition of related Corporations as separate legal entities and with the trend of RICO case law in other jurisdictions. Securiton Magnalock Corp. v Schnablock, 65 F. 3d 256, 263 (2d Cir. 1995) Jaguar Cars, Inc. v Royal Oaks Motor Car Co. Inc. 46 F. 3d 258, 268 (3d Cir. 1995) (legal separateness approach) A Corporation is an entity legally distinct from its officers or employees, which satisfy the enterprise definition. U.S v. Cappetto 502 F. 2d 1351 19 Fed. R. Serv. 2d 346 (7th Cir. 1974); Matter of EDC, Inc., 930 F.2d 1275 (7th Cir 1991).

## 7. **Hoffman Enclosures, Inc**

   A. Plaintiff is claiming that Hoffman Enclosures, Inc retaliated against him for engaging in protected activity in a judicial proceeding. DeAngelis v El. Paso Municipal Police Officer's Ass'n., 51 F 3d 591 (5th Cir.), Cert. denied 116 S. Ct. 473 (1995); Davis v Tri- State Mack Distributor, 981 F. 2d 340 (8th Cir. 1992)

   B. Plaintiff is claiming that Hoffman Enclosures, Inc. violated title U.S.C section 1512

   C. Plaintiff is claiming that Hoffman Enclosures, Inc., is an enterprise that has engaged in prohibited acts as defined in Title 18 U.S.C section 1961. A RICO "enterprise" can be "virtually any de facto or dejure association" "Seville Indus. Mach. Corp. v Southmost Mach Corp., 742 F.2d 786, 789 (3rd Cir. 1984) Proof of an enterprise need not be strictly separate from the proof of a pattern of Racketeering activity; Mccarthy v Barnett Bank of Polk County 750 F. Supp. 1119 (M.D. Fla. 1990) Nelson v Nationwide Mortg. Corp., 758 F. Supp. 747 (D. DC 1991) A Plaintiff need not, however, establish his damages through documentary evidence. OSRecovery Inc. v One Group Intern; Inc. 380 F. Supp. 2d 243 (S.D.N.Y 2005)

   D. Plaintiff is claiming that Hoffman Enclosures, Inc violated Title 18 U.S.C section 1505

   E. Plaintiff is claiming that Hoffman Enclosures, Inc violated Title 18 U.S.C section 1513.

## 8. **DHL**

   A. Plaintiff is claiming that DHL violated Title 18 U.S.C section 1505.

   B. Plaintiff is claiming that DHL violated Title 18 U.S.C section 1513.

   C. Plaintiff is claiming that DHL violated Title 18 U.S.C section 1512.

   D. Plaintiff is claiming that DHL retaliated against him for engaging in protected activity in a judicial proceeding. Robinson v Shell OIL Company 519 U.S. 337 (1997). EEOC compliance manual section 8 chapter 11 part D. Passer v. American Chemical Society, 935 f. 2d 322, 331 (D.C. Cir. 1991) (EEOC section 704(a) broadly prohibits an employer from discrimination against its employees in any way for engaging in protected activity and does not "limit its reach only to acts of retaliation that take the form of cognizable employment action such as discharge, transfer or demotion.

    E. Plaintiff is claiming that DHL is an enterprise that is engage in obstruction and retaliation in a judicial proceeding.

## CITY OF Chicago:

9. Plaintiff is claiming that the city violated his rights under Title V11 of the Civil rights Acts of 1964.
10. Plaintiff is claiming that the City of Chicago violated his Fourth Amendment 42 USC Section 1983, Fourteen Amendment due process and violated his rights under the common law of Illinois. "Mcdonnell Douglas Corp. v Green, 411 U.S 792, 802-05, 93 S. Ct.1817, 1824-26, 36 L. Ed. 2d 668 (1973); International BHD, v. United States, 431 U.S 324, 325-36 & N. 15, 97 S. Ct 1843, 1854-55 & N. 15, 52 L. Ed. 2d 396(1977). Jones v City of Chicago, 856 F. 2d 985, 994(7th Cir. 1988); Patton v Przybylski, 822 F. 2d 697, 699 (7th Cir. 1987)
11. Plaintiff is claiming intentional infliction of emotional distress, as well as conspiracy to commit these wrong.
12. Plaintiff is claiming that the City is part of an enterprise to obstruct and retaliate in a judicial proceeding.

### Cook County Jail

13. Plaintiff is claiming that Cook County Jail violated his eighth, fourteen, sixth, seventh, fifth amendments protected under the constitution of the United States of America.
14. Plaintiff is claiming intentional infliction of emotional distress, as well as conspiracy to commit these wrong.
15. Plaintiff is claiming that Cook County Jail is a part of an enterprise engage in prohibited acts to obstruct and retaliate in a judicial proceeding...

## Elgin Mental Health Center:

16. Plaintiff is claiming that EMHC violated his eighth, fourteen, sixth, fifth, and seventh amendments rights protected under the constitution of the United States of America.
17. Plaintiff is claiming that EMHC intentional infliction of emotional distress and defamation of his character.
18. Plaintiff is claiming that EMHC is an enterprise engaged in prohibited activities to obstruct and retaliate against Plaintiff for engaging in a judicial proceeding.
19. Plaintiff is claiming that EMHC violated Title 18 USC 1505.
20. Plaintiff is claiming that EMHC violated Title 18 USC 1513.

## Brian Nolan

21. Plaintiff is claiming that Brian Nolan intentional conduct caused a deprivation of his constitutional rights (Dimmig v Wahl, 983 F. 2d 86, 87 (7th Cir. 1983); Hishon V King and Spalding, 467 U.S 69, 73, 81 l. Ed. 2d 59, 104 S. ct. 2229 (1984); Murphy v Lane, 833 F. 2d 106, 107 (7th Cir 1987).
22. That Brian Nolan of Amtrak deprive him of his rights protected under the Constitution of the U.S.A.
23. That Brian Nolan of Amtrak Police acting under the cover of State law in so depriving him. (West v Atkins 487 U.S 42, 50 (1988); Bowman v City of Frakling, 980 F. 2d 1104 (7th Cir. 1992).

24. Plaintiff is claiming that Brain Nolan of Amtrak Police violated TITLE 18 U.S.C section 1503. United States v. Neal, 951 F. 2d 630, 632 (5th Cir. 1992); United States v. Vesich, 724 F. 2d 451, 454 (5th CIR. 1984).

25. Plaintiff is claiming that Brian Nolan of Amtrak Police engaged in a conspiracy to violate sec. 1503.

26. That Brain Nolan of Amtrak Police intentional infliction of emotional distress and defamation.

27. Plaintiff is claiming that Brian Nolan of Amtrak Police is a part of an enterprise engaged in obstruction and retaliation of a judicial proceeding.

**Judge Kenneth Wadas**:

28. Plaintiff is claiming that Judge Kenneth Wadas of Cook County Criminal Court violated his rights protected under the Constitution of the United States of America.

29. Plaintiff is claiming that Judge Kenneth Wadas violated his rights to the fifth, sixth, seventh eighth, fourth and fourteen amendments protected under the Constitution of the United States of America.

30. Plaintiff is claiming that Judge Kenneth Wadas is a part of an enterprise engaged in obstruction and retaliation in a judicial proceeding.

31. That Judge Kenneth Wadas acting under the cover of state law in so depriving him.

32. **Richard Kruss** Public Defendant Cook County Criminal Court:

A. Plaintiff is claiming that PD Richard Kruss violated his rights protected under the Constitution of the United States of America.

B. That PD Richard Kruss acting under the cover of state law in so depriving him.

C. Plaintiff is claiming that PD Richard Kruss violated his fifth, sixth, eighth, seventh, and fourteen amendments of the United States Constitution.

D. Plaintiff is claiming that PD Richard Kruss intentional infliction of emotional distress.

E. That PD Richard Kruss is a part of an enterprise engaged in obstruction and retaliation in a judicial proceeding.

33. **Ms. Diana Garcia- Camilo** Assistant Prosecutor of Cook County Criminal Court

A. Plaintiff is claiming that the assistant prosecutor violated his rights protected under the Constitution of the United States of America.

B. That the assistant persecutor violated his fourth, fifth, sixth, eighth, seventh, and fourteen amendments.

C. That the assistant persecutor acting under the cover of state law in so depriving him.

D. That the assistant persecutor is part of an enterprise engaged in obstruction and retaliation in a judicial proceeding.

34. **Teamsters Union**

    E. Plaintiff is claiming that the teamsters union violated Title 18 U.S.C 1505.

    F. That the Teamsters Union violated Title 18 section 1506.

    G. That the Teamsters Union violated Title 18 section 1512.

    H. That the teamsters Union violated Title 18 section 1513.

    I. That the Teamsters Union is an enterprise engaged in obstruction and retaliation in a judicial proceeding.

    J. Plaintiff is claiming intentional infliction of emotional distress and defamation of character.

35. **Julie Shopnitz SW11** Elgin Mental Health Center:

    A. Plaintiff is claiming that Julie Shopnitz SW11 of EMHC intentional violated his rights protected under the Constitution of the United States.

    B. That Julie Shopnitz SW11 acting under the cover of state law in so depriving him.

    C. That Julie Shopnitz SW11 is a part of an enterprise engaged in obstruction and retaliation of a judicial proceeding.

    D. That Julie Shopnitz SW11 violated Title 18 USC 1505; 1506; 1512; 1513.

    E. That Julie Shopnitz intentional inflicted emotional distress and defamation.

    F. That Julie Shopnitz violated his fifth, sixth, seventh eighth, and fourteen amendments.

36. **A. Nidea** M.D of Elgin Mental Health Center:

    A. Plaintiff is claiming that Dr. A. Nidea of EMHC intentional violated his rights protected under the Constitution of the United States of America.

    B. That A. Nidea acting under the color of state law in so depriving him.

    C. That A. Nidea is part of an enterprise engaged in obstruction and retaliation in a judicial proceeding.

    D. That Dr. Nidea of EMHC violated Title 18 U.S.C 1505; 1506; 1512; 1513.

    E. That Dr. Nidea of EMHC intentionally inflicted emotional distress.

37. **Romulo Nazareno** Psychiatrist Elgin Mental Health Center:

A. Plaintiff is claiming that Romulo Nazareno of EMHC intentionally violated his rights protected under the Constitution of the United States of America.

B. That Romulo Nazareno Psychiatrist of EMHC acting under the cover of state law in so depriving him.

C. Plaintiff is claiming that Romulo Nazareno Psychiatrist of EMHC violated is his rights under the fifth, sixth, seven, eighth, and fourteen amendments of the United States Constitution.

D. Plaintiff is claiming that Romulo Nazareno Psychiatrist of EMHC violated Title 18 U.S.C 1503; 1512 (b) (c)(d); 2340A.

E. Plaintiff is claiming that Romulo Nazareno Psychiatrist is part of an enterprise engaged in prohibited activity as defined in Title 18 U.S.C 1961 to obstruct and retaliate in a judicial proceeding.

F. Plaintiff claiming that the closing of his case in the Seventh Circuit Court of Appeal number 04-3585 & 05-4413, and his missing evidence at 1313 Wabash storage that was demolished while he was in custody is the direct result of his illegal custody situation.

38. **Hargurmukh Singh** Psychiatrist of Elgin Mental Health Center:

A. Plaintiff is claiming that Hargurmukh Singh Psychiatrist of EMHC intentionally violated his rights protected under the Constitution of the United States of America

B. That Hargurmukh Singh Psychiatrist of EMHC acting under the cover of state law in so depriving him.

C. Plaintiff is claiming that Hargurmukh Singh Psychiatrist of EMHC violated his fifth, sixth, seventh, eighth, and fourteen amendments of the United States Constitution.

D. Plaintiff is claiming that Hargurmukh Singh Psychiatrist of EMHC violated Title 18 U.S.C 1503; 1512 (b) (c) (d); 2340A.

E. Plaintiff is claiming that Hargurmukh Singh Psychiatrist of EMHC is part of an enterprise engaged in prohibited activity as defined in Title 18 U.S.C 1961 to obstruct and retaliate in a judicial proceeding.

F. Plaintiff is claiming that the closing of case in the Seventh Circuit Court of Appeal number 04-3585, 05-4413, and his missing evidence at 1313 Wabash Storage is a direct result of his illegal custody situation.

39. **Elizabeth Siavon RN** Nurse of Elgin Mental Health Center:

A. Plaintiff is claiming that Elizabeth Siavon RN Nurse of EMHC intentionally violated his rights protected under the Constitution of the United States of America.

B. That Elizabeth Siavon RN Nurse acting under the cover of state law in so depriving him.

C. Plaintiff is claiming that Elizabeth Siavon RN Nurse violated his eighth and fourteen amendments protected under the Constitution of the United States of America.

D. Plaintiff is claiming that Elizabeth Siavon RN Nurse violated Title 18 U.S.C section 1503; 1512 (b) (c) (d); 2340 A.

E. Plaintiff is claiming that Elizabeth Siavon RN Nurse is part of an enterprise engaged in obstruction and retaliation in a judicial proceeding.

40. **Northern District Federal Court of Illinois:**

A. Plaintiff is claiming that the Northern District Federal Court of Illinois is an enterprise engaged in obstruction and retaliation of a judicial proceeding.

7

B. Plaintiff is claiming that the Northern District Federal Court Illinois violated his rights under the fifth and fourteen amendments of the United States Constitution.

C. Plaintiff is claiming that as the result of that he has suffered injury in his business/ property.

41. **HISTORY OF THE CASE**:

A. Plaintiff was probing a syndicate from New York City in the illegal dumping of toxic waste in his native country geographic area in 1981(Liberia). Plaintiff believes as a result of that investigation he became a target of the teamsters union for harassments that would lead into several set-ups.

B. In 1993 in a series of set-ups he plea-bargains to a sexual assault charge that he did not commit and blame on set-ups by the teamsters union in Alameda County, California.

C. In 2000 again as a result of set-ups he landed at Hoffman Enclosures, Inc., a Corporation owned by Mr. Lakshmi Mittal and unionized by the teamsters union. During that period he was a target of additional harassments both from the teamsters union and people working for Mr. Lakshmi Mittal as a result of him discovering violation of federal laws, and getting involved in labor issues at the Corporation.

D. Plaintiff filed grievances with the Minnesota Human Rights Commission and the EEOC. As the result of his participation in this process a campaign of harassments began that included violation of Title 18 U.S.C 1503, 1512 (b) (c) (d). Plaintiff was literally chased and terrorized to prevent him from suing after he got the right to sue from the EEOC in 2001.

E. In another set-up 2002, he landed at McDelivery another Corporation associated with Mr. Lakshmi Mittal and the Teamsters Union for harassments. The harassment got so intense that Plaintiff took off and went to Brazil seeking refuge. Plaintiff returned from Brazil after a little less than two months and was chased from States to States. Plaintiff went indoor for most of 2003, at this point he had been label pimp, snitch, supported of terrorism, terrorist and child molested, but of course there were no evidence to support any of these labels; It was meant to keep him from filing grievances in court and to continue the campaign of harassments.

F. Plaintiffs continue to collect evidences of his harassments. Evidences that would later be stolen from storage by the enterprises of Mr. Lakshmi Mittal.

G. In 2004, in another set-up to finish him off he landed at DHL, another of Mr. Lakshmi Mittal's Corporation. Again the pattern of violation of Title 18 U.S.C section 1503, 1512 (b)(c)(d) continue, Plaintiff again got the right to sue from EEOC after filing grievances, it was during this period that Plaintiff filed a Civil Rights violation and Title V11 violation as a pro-se under RICO. Case number 1:04 cv 04476 Romeo Ezike v Hoffman Enclosures, Inc., Mike Bauman, and DHL.

H. In 2005, after so many irregularities that were allowed by the magistrate in discovery, committed by the powerful law firm of Seyfarth Shaw the case was dismissed. Plaintiff filed an appeal with the Seventh Circuit Court of Appeal.

Once the Appeal number was issue 05-4413, Plaintiffs was arrested by Amtrak Police as he was making arrangement to travel to his home state of California.

I.  Plaintiff was told that there was a warrant and charge from California that turned out to be untrue, and he was charged as a child molester by the Cook County persecutor which of course is untrue. Plaintiff is not a child molester and the charge was meant to punish, retaliate and end his life.

J.  Plaintiff was tortured as in Title 18 U.S.C 2340A Cook County Jail and Elgin Mental Health Center to plea guilty to the charge which he would refused. The criminal charge was dropped on December 20th 2007 after Plaintiff had spent a little over twenty-six months in custody, and after failed attempts by the Elgin Mental Health Center to keep him civilly.

K.  During his illegal custody in Cook County jail, the civil case pending in the Seventh Circuit Court of Appeal was closed because he physically was unable to continue the process in the Seventh Circuit Court of Appeal schedules.

L.  During his custody at Elgin Mental Health Center, he filed two cases with the Northern District of Illinois 07c1974 Romeo Ezike v Elgin Mental Health Center He beaus Corpus for relief, and 07c1972 Romeo Ezike v Amtrak for relief to recover his damages to his business and property. In both cases the appearance of the enterprises took over the cases. Plaintiff case from the hebaus relief was terminated even though the defendant was in violation of court's order to response. The Civil case against Amtrak seeking relief under RICO was dismissed for failure to provide an address. Plaintiff have provided the Court through the Clerk office a United States Postal address that the clerk have used before the dismissal of the case and after the dismissal of the case.

M.  Plaintiffs continue to be harassed as the enterprises interrupt his use of the public library in San Francisco, and other public facility. Plaintiff is seeking relief in this court.

42. Plaintiff is filing separate pleading under California Civil Code section 3333 for compensatory and punitive damages, California Civil Code section 3294 damages for imprisonment under California Penal Code section 836.

On November 28th 2005, Plaintiff was detained by Amtrak Police Officers Pietra and her partner. Later Plaintiff was seized and arrested at the Amtrak Police Station at Union Station in Chicago, Illinois after he was invited to file a complaint for unlawful detention by defendant Brian Nolan of Amtrak Police. The defendant had no warrant or order of committed or any legal authority of any kind, when Plaintiff had not committed any crime or public offense in his presence. Defendant accused plaintiff of failure to register as a sex offender in Chicago, but the offense did not occurred, nor does the defendant had probable cause to believe that it occurred or that plaintiff had committed it, nor does Amtrak keep record of registration. The law enforcement agency responsible to investigate registration issue is the Chicago Police in Chicago, Illinois. Plaintiff is seeking damages that he incurred as a result of his case in the Seventh Circuit Court of Appeal closing as the result of his illegal imprisonment. The Officer made several misleading statements about his authority to arrest plaintiff. He said that he was order by the Attorneys General of both California, and Illinois and that he was using his federal police power. (A conflict under the Tenth amendment.) The Constitution specially

9

authorizes federal enforcement of three types of laws all uniquely federal concern (a) To provide for the punishment of counterfeiting the Securities and current coin of the United States; (b) To define and punish piracies and felonies committed on the high sea, and offenses against the Laws of Nations; (c) That Congress shall have power to declare punishment of treason. The prosecution decision to charge, the grand jury decision to indict, a prosecution decision not to drop charges but to proceed to trial, none of these decision shield a law enforcement officer who deliberately provide misleading information that influences a decision.

43. **Conclusion:**

    A.    Plaintiff is a pro-se and not a lawyer or legal scholar, and do not pretend to be one. The United States is not only a market, it is a nation that has a document that is an ongoing experiment that documents we all have to abide bye, it is a document with precedent and the primary authority which this case is based. The document is the United States of America Constitution.

    B.    Plaintiff has been a victim of an organized campaign of harassment supported by the resources of one of the riches man in the world. That power and money plaintiff cannot match, but his tenacity and resolve to petition the government to address grievances is not going to be sabotage by money and power.

    C.    Plaintiff continues to be targeted for harassment although with less intensity than it was before his arrest and incarceration. There are several things that can only be address later in discovery. The fact is that plaintiff has suffered damages and injury to business/property and is seeking recovery. Plaintiff is also seeking relief under California Ralph Civil Rights Act Civ. Code sec. 51.7 Prayer for relief.

Dated: *April 7th 2008*

Romeo Ezike
P.O BOX 425126
San Francisco, Ca 94142

Respectfully
Romeo Ezike
*Romeo Ezike*

List of Exhibits

1) Exhibits 38-82 [ hearing on April 12th 2006 ]

2) Exhibits 1 & 2 Plaintiff's Complaint at the Amtrak Police Station November 28th 2005

3) Exhibit 15 - Judge Kenneth Wadas Order. August 28th 2006

4) Exhibit 24 & 25 Elgin Mental Health Center Evaluation.

5) Exhibit 26 - Suspension of Plaintiff's Rights to refuse Drugs, He was shot with Psycho-Tropic Drugs.

6) Exhibit 32 Plaintiff's Appeal to the first Appellate court of Illinois. granted

11

7) Exhibits 96, 97, 89, 90, 91, 92
93, 84, 85, 86, 87, 121, 83
Elgin Mental Health Center And
Cook County Criminal Court release
forms.   Case Dismissed

(8) Exhibit 3, 4, 5 Chicago Criminal
Check on November 28th 2005. It
Showed that plaintiff was not a fugitive
or warrant out for his Arrest.
Letter from the Attorney General
from Illinois.

19) Exhibits 6, 7 Attempts by the
Elgin mental Health Center to
keep him civilly. Letter to the
Head of Elgin Mental Health
Center from plaintiff demanding
his release.

## AMTRAK POLICE DEPARTMENT
## COMPLAINANT/WITNESS STATEMENT

| | |
|---|---|
| **2. NATURE OF INVESTIGATION** | **3. FIC/UCR NO.** |
| COMPLAINT AGAINST POLICE | |

**4. STATEMENT OF:** (Last, First, Middle Name)
EZIKE, ROMEO GABRIEL

| **5. DOB** 10/28/59 | **6. SEX** MALE |

**7. HOME ADDRESS**
P O BOX 803513, CHGO. IL. 60680

**8. HOME PHONE** E-MAIL
REZIKE@YAHOO.COM

**9. EMPLOYMENT** (Occupation and Location)
UNEMPLOYED BECAUSE PHYSICAL & METAL HARRASMENT

**10. BUSINESS PHONE**
N/A

**11. LOCATION STATEMENT TAKEN**
210 S. CANAL, CHGO IL. APD OFFICE

**12. SOCIAL SECURITY NO.**
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

**13. NAME OF OFFICER TAKING STATEMENT** (If other than block 14, include signature)
SGT. BLONDIN

**14. DATE/TIME STARTED**
11/28/05 0915

**15. STATEMENT:** I believe that I am been harassed by the AMTRAK Police. because of my case in the Seventh Circuit Appeal Court. I have made a complaint previously against other officers at this Union Station in Chicago. This particular incidence occurred this morning when I observed two officers one female and a male monitoring my movement in the Union station. I approached them and informed them that I observed that they were monitoring me because of my lawsuit in the appeal court. One of the officers Badge # A P D 241 K. PIEDRA

**16.** I HAVE READ THIS STATEMENT GIVEN BY ME OR I HAVE HAD IT READ TO ME. I FULLY UNDERSTAND IT AND CERTIFY THAT IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND RECOLLECTION. I UNDERSTAND THAT MAKING A FALSE STATEMENT IS PUNISHABLE BY CRIMINAL PENALTIES.

**17. DATE/TIME ENDED**

Signature of Person Giving Statement

**18. Page      of      Pages**

| **19. OFFICER OBTAINING SIGNATURE IN BLOCK 16** | **20. PERSON WITNESSING SIGNATURE IN BLOCK 16** |
|---|---|
| (Name and Signature) | |

Exhibit 1

## AMTRAK POLICE DEPARTMENT
## COMPLAINT/WITNESS STATEMENT

**15. STATEMENT CONTINUATION:**

than Ordered me to give her
my identification. I complied
but was detained for no
apperence reason. I asked to
see the Sargeant to ledge a
complaint against their actions.
The male officer asked to
have the Sergeant come on
the scene of which she did.
Therein I explained my
situation to Sergeant Blahiden
and later went to the Office
and filed this complaint of
harassment against these
officers. This is not the first
time, and on other occasions
I have Experience harassment by
other officers of this

Exhibit 2



**CHICAGO POLICE DEPARTMENT**
3510 South Michigan Avenue/Chicago, Illinois
60653
Identification Section



**CRIMINAL HISTORY REPORT**

CPD-31903C (REV. 7/04)

## IUU COMPLETE

## EZIKE, ROMEO

IR #    **1754827**

SID #

FBI #

$f$ $o$ $f$ $\triangle$

IDOC #

Current Arrest Information:

| | |
|---|---|
| Date of Birth: | **29-OCT-1959** |
| Age: | **46 years** |
| Place of Birth: | **ILLINOIS** |
| SSN #: | **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** |
| Drivers License #: | |
| Drivers Lic. State: | |
| Scars, Marks &Tattoos: | |

Key Historical Identifiers:

| Alias or AKA used | Date Used | Dates of Birth Used | Social Security Numbers Used |
|---|---|---|---|
| **EZIKE, ROMEO** | **28-NOV-2005** | **29-OCT-1959** | **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** |

Criminal Justice Summary: Total arrests: 1 (1 Felony, 0 Misdemeanor)          Total convictions: 0

═══════════════════════════ ARREST ═══════════════════════════

Arrest Name: **EZIKE, ROMEO**

Date of Birth: **29-OCT-1959**

DCN or CB: **016378603**
Officer:    **NOLAN**

Arrest Date:    **28-NOV-2005**    Holding Facility: **CPD - CENTRAL MALE**

Arrest Address: **210 S CANAL ST CHICAGO, IL 60606**

Residence:    **646 S STATE ST CHICAGO, IL 60605**
Officer Badge#: **389**    Arresting Agency: **AMTRAK PD**

$+C$

Count Class Type Statute .............................. Arrest Charge Description .......................................................... Inchoate ...............

**[1]    4    F    730 ILCS 150.0/3-A    ,    Viol Sex Offender Registation**

## ***End of Report***

This Chicago Police Department IR rap-sheet should not replace the use of the Illinois State Police statewide criminal history transcript, which may contain additional criminal history data and can be obtained by performing a CQR1 inquiry via your LEADS terminal.

28-NOV-2005 18:33

$Exhibit$ $3$

Requested by: PC0I530

## LEADS AUTOMATED CRIMINAL HISTORY

LE V _ EZIKE, ROMEO_ ͏

_M_ RACE _B_     DOB: _10_ , _29_ , _59_

S _____     PLACE OF BIRTH _____

_1754827_     SID _____

_384309 NAS_     SOCIAL SECURITY _____

R STATE NUMBERS: _____

**LEADS HAS NOT PROVIDED A CRIMINAL HISTORY DUE TO THE FOLLOWING:**

| | |
|---|---|
| _✓_ NO HIT ON SID SHEET | _✗_ NO HIT ON FBI SHEET |
| ____ FINGERPRINTS SENT TO SID | ____ FINGERPRINTS SENT TO FBI |
| ____ SID SHEET INCOMPLETE | ____ FBI SHEET MANUAL |
| ____ SID SHEET ORDERED | ____ FBI SHEET ORDERED |
| ____ SID COMPUTER DOWN | ____ FBI COMPUTER DOWN |
| | ____ **ILLINOIS ARRESTS ONLY!!!!** |
| | **NO FBI SHEET WILL PRINT** |

COMPARISON: _____ VS _____

____ NEGATIVE     _____ SAME/TO BE COMBINED     _____ PREVIOUSLY COMBINED

PERSONNEL THAT COMPARED FINGERPRINTS & DATE: _____

OLE INFORMATION:

INMATE NUMBER _____

_____ ON PAROLE     _____ **WARRANT LODGED**

_____ **DISCHARGED**     _____ **HOLD LODGED**

MENTS: _____

_Exhibit 4_



## OFFICE OF THE ATTORNEY GENERAL
### STATE OF ILLINOIS

**Lisa Madigan**
ATTORNEY GENERAL

January 31, 2007

Romeo Ezike
Elgin Mental Health Center
750 S. State Street, #G
Elgin, IL 60123

      Re: Your Complaint to the Illinois Attorney General's Office

Dear Mr. Ezike:

      The Civil Rights Bureau of the Illinois Attorney General's office is in receipt of your complaint in which you allege misconduct by the Teamsters Union and Lakshmi Mittal.

      Our bureau primarily investigates civil rights complaints that demonstrate a pattern and practice of discrimination toward a protected class such as race, color, religion, sex, national origin, ancestry, age, marital status, military status, sexual orientation, unfavorable discharge from military service in connection with employment, real estate transactions, access to financial credit and the availability of public accommodations. Unfortunately, we will not be able to assist you because we lack jurisdiction over this matter. This letter should not be considered a determination of the merits of your allegations or the result of any findings of fact or law.

      If you believe that we can assist you with any other civil rights related matters, please do not hesitate to contact our office.

      Sincerely,

      Maya M. Kinatukara
      Assistant Attorney General
      Civil Rights Bureau
      (312) 814-8109
      mkinatukara@atg.state.il.us

ExLibit 5

# State of Illinois

## Circuit Court for the 16th Judicial Circuit

## KANE County,

### Order for Treatment or Discharge

In the matter of  ROMEO EZIKE                    07 MH 183

This matter coming to be heard on the petition of _____ MS. PAUL SHOPNITZ _____ and the
Court being fully advised

It is therefore ordered that:

[ ] Defendant discharged _____ _____

[ ] It is hereby ordered on Involuntary Admission

[ ] Patient does NOT require hospitalization and/or

It is further ordered that the patient be:

[ ] hospitalized

[ ] placed in a residential non-hospital facility which is the least restrictive alternative
treatment available to respondent

[ ] ordered to comply with an order for outpatient care

| Clerk of the Circuit Court |
| Kane County, IL |
| **DEC 2 8 2007** |
| FILED        17 |
| ENTERED |

Judge _____    Date _____

### Notice to Persons Receiving this Order

[illegible text]

[illegible text]

[illegible text]

[illegible text]

[illegible text]

ME... Health Center.

: ROMEO Ezike :

: December 26th 2007

T: Objection to petition

I Romeo Ezike object to any
tition filed to force me to submit
mental evaluation at Elgin Mental
lth center. Elgin Mental Health
nter is a party to a civil law-
suit filed by me pending in Federal
urt.

I was arrested by Amtrak
lice, charged with a false charge
isoned, harassed and tortured. All part
of an elaborate scheme to retaliate
or a civil lawsuit pending in the
seventh circuit court of Appeal against
the teamsters union and corporation of
Mr. Lakshmi Mittal. The charge
has been dropped, and I demand my
immediately release from unlawful
custody.

Respectfully
Romeo Ezike

*[handwritten top margin]* Romeo Ezike / Received on January 5th 2007 From / Social Worker Elgin.

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

CRIMINAL DIVISION / MUNICIPAL DEPARTMENT-DISTRICT ———

No. 5

LINE No. 1

| PEOPLE OF THE STATE OF ILLINOIS | No. 05CR2924201 |
| v. | SID |
| EZIKE, ROMEO | IR 1754827 |

ADDENDUM TO PREVIOUS ORDER SETTING BAIL AND COMMITTING THE DEFENDANT TO THE COOK COUNTY DEPARTMENT OF CORRECTIONS FOR FAILURE TO DEPOSIT BAIL.

## ORDER

THIS MATTER COMING BEFORE THE COURT AND THE COURT BEING FULLY ADVISED IN THE PREMISES, IT IS HEREBY ORDERED:

*[handwritten]* Unfit for trial defendant remanded to dept of human Service (mental Health) 9-28-06

**ENTERED**
JUDGE KENNETH WADAS • 1700
AUG 28 2006
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL
DEPUTY CLERK

DISPOSITION(S) MUST REFLECT WHICH COUNT(S) THE ORDER(S) IS/ARE APPLICABLE TO.

ENTERED:

DATED: AUGUST 28 2006      KENNETH J. WADAS
                          Judge

DEPUTY CLERK _____      ROOM/BRANCH 302

PAGE 1 OF ___ PAGES      at 9:30 AM a.m. / p.m.

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY**

HIS707-500M-7/10/02(49359)      COOK COUNTY DEPT. OF CORRECTIONS

*[handwritten]* Exhibit 15

## Interdisciplinary Staffing
## Forensic Treatment Program

t Diagnoses: (All applicable axes)

s I: Delusional Disorder,
secutory Type

ns to be treated or deferred were identified by team consensus and are recorded on the
n List (DOC-1180).

's Progress Since Last Staffing and Extent to Which (s)he is Benefitting from Treatment:

Ezike was admitted to EMHC on 10/05/06. He
temporarily housed on the Hartman unit due to
of beds on our unit. He was transferred to FG
10/06/06.

tient is currently subject to involuntary admission, explain why:

ent was remanded to the Department of Human
vices, by court order, as unfit to stand
al.

Criteria for Discharge: 1) Psychiatric Stabilization,
Restoration of fitness

ted Date of Achieving Clinical Criteria for Discharge: 02/2007

to Treatment and Aftercare Plan (if any): Designated agency still
ds to be determined. He is originally from
Enoria, was essentially homeless in Chicag

IN MENTAL HEALTH CENTER
nterdisciplinary Staffing
rensic Treatment Program
Page 1 of 2

?, Revised 05/23/2005

| Patient Name: ROMEO EZIKE | |
|---|---|
| Date of Birth: 10/29/59 | Sex: M |
| DHS-OMH ID#: 87531    Admit Date: | |
| Facility:   Elgin Mental Health Center | |
| Unit/Subunit: FH 45GP   Date Completed: | |

70-FTP
of 2   Patient Name: Eziko, Romeo .   ID#: 871531   Date: 10/10/06

**atient Participation in Treatment Planning** (Check and comment as appropriate)

| Jnable [ ] | Refused [ ] | Present [X] | Contributed [X] | Aware of Plan [X] |

atient comments/contributions to the treatment planning process: Mr. Eziko states
"I have a situation going on with the teamster
unit." "I refused to plea bargain to a
false charge." "I have no mental problem."

**escribe Involvement of Family, Significant Other and/or Guardian since last staffing:**
Mr. Eziko does not want his family contacted

**For Unfit to Stand Trial (UST) patients only. A brief assessment of fitness to stand trial.**
Mr. Eziko was adjudicated unfit to stand trial
by the Circuit Court of Cook County and sent
to this hospital for fitness restoration

| **Participants in the Treatment Plan Staffing** | **Title or Relationship to the Patient** |
|---|---|
| Julie Shapira, LCSW | Psychologist SWII |
| Monte my pw | Sw II |
| Lorraine Russell | by I |
| R. Naraman | Psychiatrist |
| Tyrone Turin Kcow | SW II |
| Mark Boyd | Psych Extern |

I best learn by: _____ Visual Aides _____ Demonstration/Example _____ Group
_√_ Written Instruction _____ Other

I was offered a copy of the treatment plan.  Yes ☑   No ☐

Patient: Romeo Eziko
         Signature                                    Date

Recorder: Julie Shapira, SWII          Date 10/10/06
          Signature                                  Date

Treating Psychiatrist: R. Naen          10/10/06
                       Signature                     Date

Exhibit 25

*Exhibit 26*

Reference: 405 ILCS 5/2-102, 2-103, 2-104, 2-107, 2-108, 2-109, 2-200 and 2-201

## NOTICE REGARDING RESTRICTED RIGHTS OF INDIVIDUAL

Name: *ERIK ROMEO*    ID#: *87153*    Facility: *EMHC*

---

A. On _11/20/06_ at _1510_ ☐ AM ☐ PM he or she was:
(Date)    (Time)

    ☑ Placed in restraints    ☐ Placed in seclusion    ☐ Received emergency forced medication

B. Had a restriction placed on certain rights (which are checked and explained below) for duration of

  HOURS: _____    DAYS: _____    FROM: _____    TO: _____
                                               Date/Time                    Date/Time

☐ To refuse medication      ☐ To manage his or her own personal hygiene      ☐ To refuse dental services
☐ To refuse medical service - x - ray    ☐ To refuse medical service - laboratory specimens    ☐ To retain personal property
☐ To be allowed communication* via:    ☐ To refuse other medical treatment services    ☐ Search of person or living area
     ☐ telephone   ☐ mail   ☐ visitation      ☐Other (Specify): _____

The reason(s) for restriction of rights is (are): *Physically aggressive & combative*

A or B (above)  Date: _11/20/206_    *Elizabeth Stason*     *RN*
                                    Signature                      Title

---

In accordance with the Mental Health and Developmental Disabilities Code, the individual designated his or her preference for emergency intervention if circumstances arise.

On _11/20/06_ , the individual required emergency intervention, as described in Part I Above.
(Date)

☐ Individual indicated "No Preference" for emergency intervention(s) and ☐ Restraint ☐ Seclusion ☐ Emergency forced medication was used.
☐ The intervention preferred by the individual: ☐ was used (See IL 462 - 0120M); ☑ was not used due to the following:

_____
*pt deemed to be physically aggressive & violent*
_____

---

I certify that on _11/20/06_ , *Elizabeth Stason*     *RN*
        (Date)                      (Name)                   (Title)
☑ Delivered in person and ☐ mailed a copy of this notice in ☐ English ☐ Spanish ☐ _____
    to each of the following entitled to receive notice, unless:                 Other (Specify above)
☑ Individual wished no one to be notified. EXCEPTION: GUARDIAN OF PERSON**;

| CONTACT | NAME | ADDRESS |
|---|---|---|
| Guardian of Person | | |
| Designated by Individual | | |
| Representative of Guardianship and Advocacy Commission or Equip for Equality | | |

---

I certify that a copy of this Notice has been placed in the individual's record.

Staff Signature: *Elizabeth Stason  RN*

\* Also see the reverse side if mail, telephone, or visitation rights are being restricted.
\*\*Designated Guardian of Person must be notified regardless of individual's wishes.

**ORDER**

IN THE APPELLATE COURT, STATE OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| Plaintiff-Appellee, | ) | No. 07-**0732** |
| | ) | |
| v. | ) | Circuit Court No. 05CR29242 |
| | ) | |
| ROMEO EZIKE, | ) | Hon. Kenneth Wadas, |
| Defendant-Appellant. | ) | Judge Presiding |
| | ) | |

**ORDER**

ON MOTION OF APPELLANT PRO SE, FOR LEAVE TO FILE A MOTION FOR LATE
NOTICE OF APPEAL AND APPOINTMENT OF COUNSEL (Appeal from Order of 9/28/06);

**IT IS HEREBY ORDERED** THAT THE MOTION FOR LEAVE TO FILE LATE NOTICE

OF APPEAL IS

_____ X _____ **GRANTED,** and the Office of the Cook Count
Public Defender _____ is appointed as counsel.
**THE CLERK OF THE APPELLATE COURT IS DIRECTED TO TRANSMIT THE
NOTICE OF APPEAL TO THE CLERK OF THE CIRCUIT COURT.**

_____ **DENIED**.

Name    Romeo Ezike
         20050093262
Address
         Elgin Mental Health Center
         750 S. State   Unit G
         Elgin, IL 60123

_____
Justice

_____
Justice

_____
Justice

**ORDER ENTERED**

APR 0 4 2007

APPELLATE COURT, FIRST DISTRICT

STEVEN M. RAVID, CLERK OF THE APPELLATE COURT, FIRST DISTRICT

Exhibit 32

Exhibit 83

SHEET No.

LINE No.

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
CRIMINAL DIVISION / MUNICIPAL DEPARTMENT-DISTRICT ——

PEOPLE OF THE STATE OF ILLINOIS

vs.

Romeo Ezike

No. 05 CW 29242 01

SID

IR

ADDENDUM TO PREVIOUS ORDER SETTING BAIL AND COMMITTING THE DEFENDANT TO THE COOK COUNTY DEPARTMENT OF CORRECTIONS FOR FAILURE TO DEPOSIT BAIL.

## ORDER

THIS MATTER COMING BEFORE THE COURT AND THE COURT BEING FULLY ADVISED IN THE PREMISES, IT IS HEREBY ORDERED:

△ Discharged
. Off call
A to be transported back to ELGIN
to be evaluated for CIVIL
committment                    DHS

**ENTERED**
JUDGE KENNETH WADAS-1700
DEC 1 9 2007
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
DEPUTY CLERK
COOK COUNTY, IL

DISPOSITION(S) OF THE ABOVE WHICH COUNT(S) THE ORDER(S) IS / ARE APPLICABLE.

ENTERED _____

DEPUTY CLERK Patricia Gordon

JUDGE

No.

ROOM/BRANCH _____ 1700

PAGE ___ OF ___ PAGES                    AT _____ AM / PM

**DOROTHY BROWN**

**CLERK OF THE CIRCUIT COURT OF COOK COUNTY**

COOK COUNTY DEPT. OF CORRECTIONS

AIS707-220M-7/10/02(25291398)

*Exhibit  84*

No. 07-0732

## IN THE APPELLATE COURT OF ILLINOIS
### FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of Cook |
| Plaintiff-Appellee, | ) | County, Criminal Division. |
| | ) | |
| v. | ) | Circuit No. 05 CR 29242 |
| | ) | |
| ROMEO EZIKE, | ) | Honorable |
| | ) | Kenneth Wadas, |
| Defendant-Appellant. | ) | Judge presiding. |

## MOTION TO FILE THE CERTIFICATE IN LIEU OF THE RECORD INSTANTER

The defendant-appellant, Romeo Ezike, by and through his attorneys, Edwin A. Burnette,

Public Defender of Cook County, and Lester Finkle, Assistant Public Defender, moves this Court

for leave to file the certificate in lieu of the record on appeal instanter. Reasons in support of this

motion are given in the attached affidavit of Lester Finkle.

Respectfully submitted,

EDWIN A. BURNETTE
Public Defender of Cook County

By: *Lester Finkle*

Lester Finkle
Assistant Public Defender

Public Defender of Cook County
Attorney for defendant-appellant
69 West Washington Street - 15th Floor
Chicago, IL   60602
312.603.0600

Exhibit 85

STATE OF ILLINOIS )
                ) ss.
COUNTY OF COOK )

## AFFIDAVIT

Lester Finkle, being first duly sworn on oath, deposes and says as follows:

1. I am an attorney in the State of Illinois, and currently employed as an Assistant Cook County Public Defender, Attorney Supervisor, assigned to the Legal Resources Division.

2. The defendant, Romeo Ezike, was charged with a violation of the Sex Offender Registration Act. An issue was raised as to his fitness to stand trial, and a trial as to fitness was held on August 28, 2006. Mr. Ezike was found to be unfit by Judge Wadas, and he was committed to the care of the Department of Human Services, Division of Mental Health. Mr. Ezike filed a late notice of appeal, which this Court allowed on April 4, 2007.

3. The Public Defender was appointed as appellate counsel on April 20, 2007. The common law record was received on May 3, 2007. The transcript of the proceedings was received on November 14, 2007. The record on appeal was due to be filed on or before June 13, 2007.

4. The record is complete with respect to the issue on appeal. It consists of one volume of common law record and one volume of report of proceedings. The delay in filing this record was not due to any negligence on the part of Mr. Ezike. I apologize for the delay and ask leave to file the certificate in lieu of the record instanter.

FURTHER AFFIANT SAYETH NOT.

_____
Lester Finkle

Subscribed and sworn to before
me this 16th day of November, A.D., 2007.

_____
Notary Public

OFFICIAL SEAL
HERMENIA GREEN
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 5-13-2009

*Exhibit 86*

(Rev. 2/9/00)  CCCR 0006

~~ATE OF ILLINOIS~~ } ss:
~~UNTY OF COOK~~

**#07-0732**

1 volume CLR
1 volume rep. of proc.
2 volumes total

### APPEAL CERTIFICATE

I, **DOROTHY BROWN**, Clerk of the Circuit Court of Cook County, Illinois, County Department - Criminal ~~sion~~, in said County and State and Keeper of the Records and Seal thereof, do hereby certify that on ____**April 4, 2007**____ a Notice of Appeal was filed in said Court and thereafter in accordance ~~n~~ the provisions as set forth by Supreme Court Rule 608, the Record on Appeal wherein

**PEOPLE OF THE STATE OF ILLINOIS,** versus ____**ROMEO EZIKE**____

~~tment~~ Number ____**05 CR 29242**____ was prepared by my office.

I do further certify, that on ____**April 24, 2007**____ the aforementioned Record was ~~d~~, numbered, and picked up by ____**THE LAW OFFICE OF THE PUBLIC DEFENDER**____

____**69 WEST SAHSINGTON STREET, 16TH FLOOR**____ Chicago, Illinois, ~~ing~~ in the ____**APPELLATE**____ Court of the State of Illinois.

I do further certify, that this Appeal Certificate pursuant to Supreme Court Rule 325, issued out of my office ____**@ th**____ day of ____**April**____, **2007** .

**DOROTHY BROWN**
Clerk of the Circuit Court of Cook County, Illinois
County Department - Criminal Division

Received from **DOROTHY BROWN,** Clerk of the Circuit Court of Cook County, Illinois, ~~D~~epartment - Criminal Division the above mentioned Record for transmittal to the **APPELLATE COURT**

____**3rd**____ day of ____**May**____ **2007** .

*Bobbie Fenton*

~~DOROTHY BROWN CLERK OF THE CIRCUIT COURT OF COOK COUNTY~~

*Exhibit 87*

No. 07-0732

## IN THE APPELLATE COURT OF ILLINOIS
### FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of Cook |
| Plaintiff-Appellee, | ) | County, Criminal Division. |
| | ) | |
| v. | ) | Circuit No. 05 CR 29242 |
| | ) | |
| ROMEO EZIKE, | ) | Honorable |
| | ) | Kenneth Wadas, |
| Defendant-Appellant. | ) | Judge presiding. |

### NOTICE OF MOTION

TO:   Richard Devine, Cook County State's Attorney, 309 Daley Center, Chicago, IL 60602

Romeo Ezike, Elgin Mental Health Center, 750 South State St., Unit G, Elgin, IL  60123

PLEASE TAKE NOTICE that on November 16, 2007, I shall cause to be filed in the Office of the Clerk of the Appellate Court of Illinois, First District, the attached motion and affidavit.

EDWIN A. BURNETTE
Public Defender of Cook County
By: _____
Lester Finkle
Assistant Public Defender

STATE OF ILLINOIS )
                              ) ss.
COUNTY OF COOK  )

Lamont James, being duly sworn on oath, says that he served the above and foregoing notice and motion and affidavit by delivering same to the Cook County State's Attorney, and by mailing same to defendant and all other parties on November 16, 2007.

Subscribed and sworn to before
me this 16th day of November, A.D., 2007.

_____
Notary Public

Received by:
Date:

OFFICIAL SEAL
HERMENIA GREEN
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 6-13-9309

*Exhibit 89*

## PETITION FOR INVOLUNTARY/JUDICIAL ADMISSION

STATE OF ILLINOIS

CIRCUIT COURT FOR THE ___16th___ JUDICIAL CIRCUIT

___Kane___ COUNTY

IN THE MATTER OF )
)                                        Docket No. _____
___Romeo Ezike___ )
(name of individual) )
)

Who is asserted to be a person subject to ___involuntary___ admission to a facility and for whom
(judicial/involuntary)

his petition is initiated by reason of: (Check all that apply)

☐ emergency admission by certificate;      (405 ILCS 5/3-600)

☒ admission by court order;   (405 ILCS 5/3-700)

☐ voluntary admittee submitted written notice of desire to be discharged;  (405 ILCS 5/3-403)

☐ voluntary admittee failed to reaffirm a desire to continue treatment;   (405 ILCS 5/3-404)

☐ person continues to be subject to involuntary admission;   (405 5/3-813)

☐ emergency admission of the mentally retarded;   (405 ILCS 5/4-400)

☐ judicial admission of the mentally retarded;  (405 ILCS 5/4-500)

☐ developmentally disabled client or an interested person on behalf of the client submitted written objection to
admission;   (405 ILCS 5/4-306)

☐ administrative client; (or person who executed application) failed to authorize continued residence
(405 ILCS 5/4-310);  and

☐ client continues to meet standard for judicial admission.    (405 ILCS 5/4-611)

DD-5)
2-2005 (R-3-04) Ⓔ                                   Page 1 of 5

Exhibit O

I assert that ___Romeo Feike___ is: (check all that apply)
(name)

☒ an individual who is mentally ill and who because of his or her illness is reasonably expected to inflict serious physical harm upon himself or herself or another in the near future which may include threatening behavior or conduct that places another individual in reasonable expectation of being harmed;

☒ an individual who is mentally ill and who because of his or her illness is unable to provide for his or her basic physical needs so as to guard himself or herself from serious harm without the assistance of family or outside help

☐ an individual who is mentally retarded and is reasonably expected to inflict serious physical harm upon himself or herself or others in the near future; and/or

☒ in need of immediate hospitalization for the prevention of such harm.

I base the foregoing assertion on the following (provide a detailed statement including a description of the signs and symptoms of a mental illness and of any, acts, threats, or other behavior or pattern of behavior supporting the assertion and the time and place of their occurrence. Additional page(s) may be attached as necessary):

Please see attached sheet

Below is a list of all witnesses by whom the facts asserted may be provided (include addresses and phone numbers):

Romulo Nazanono, MD Elgin MHC, (847) 4

Julie SHOPN ITS, SUII Elgin MHC, (847) 4

I ☐ do ☒ do not have a legal interest in this matter.

I ☐ do ☒ do not have a financial interest in this matter.

I ☐ am ☒ am not involved in litigation with the respondent.

☐ Although I have indicated that I have a legal or financial interest in this matter or that I am involved in litigation with the respondent, I believe it would not be practicable or possible for someone else to be the petitioner for the following reasons:

_____

_____

Exhibit 91

## PETITION FOR ROMEO EZIKE

Romeo Ezike was admitted to Elgin Mental Health Center on 10/05/2006 as Unfit to Stand Trial on charges of Failure to Report Change of Address as a Sex Offender. He has been diagnosed with a mental illness, Delusional Disorder, Persecutory Type. He has refused to take recommended medication to treat the symptoms of his psychiatric disorder. He denies he suffers from any psychiatric illness. He will not participate in treatment. He states he has been held at this facility "illegally" and his criminal charges are the result of a civil lawsuit he filed against the Teamsters Union.

Mr Ezike has made numerous statements claiming people were plotting against him. Mr. Ezike stated people were "trying to get me set up in an accidental death." He stated staff were receiving "instructions from mob figures" and acting "provocative" towards him. He claimed his hospitalization was a "hostage, kidnap situation." He has stated his food has been poisoned. He will only accept a food tray if he can randomly select it from the cart. He will not accept a tray if a staff member has touched the tray. He has stated he is being "harassed " by his peers and that the peers have been instructed by staff to do this.

Mr. Ezike has refused to cooperate with any type of discharge planning. Staff has offered to apply for funding for him, link him to a mental health center, and refer him to a residential facility. He has refused all attempts to develop a discharge plan. He has no known financial means and will not disclose where he plans to live. He has refused to allow any family member or significant others to be contacted.

11/19/06:
Mr. Ezike was involved in a verbal altercation with a peer. He was later observed walking past the peer in the hall and brushing up against the peer with his shoulder. For the protection of both patients, Mr. Ezike was transferred to another unit on 11/20/06. He became upset. He was offered voluntary medication, which he refused. Security was called for assistance. He became combative with security when an attempt was made to administer the medication. He was placed in restraints for protection of self and others.

03/08/07:
He approached staff about going to the Criminal Court of Cook County the next day. There was no court hearing scheduled and he was informed that he was not going to court. He became upset, started talking rapidly, and raised his voice. Staff had to end the conversation and leave the area.

03/29/07:
Mr. Ezike became agitated during breakfast. A peer threw a napkin and it landed on his tray. Mr. Ezike called the peer "you nigger" several times and threatened to hurt the peer if it happened again.

06/22/07:
Mr. Ezike became loud and verbally abusive to staff when asked to leave the laundry room. He

*Exhibit 92*

accused staff of letting patient interfere with his laundry.

08/02/07:
Mr. Ezike was talking with another peer about safety issues. He made a comment to a staff in an angry tone, "I have something on you." Staff walked away and Mr. Ezike appeared to become more angry.

08/23/07:
A Tornado Warning was issued. Staff and patients were advised to stand in the inner hallway for safety. Mr. Ezike refused, sitting closer to a large glass window. It was very windy and raining very hard. Several staff members approached him explaining the danger. He has to be prompted several times to move to a safe area, putting himself and the staff in physical jeopardy.

11/07/07:
Some of Mr. Ezike's mail was returned due to the high cost of the envelope he sent out. Staff tried to explain why the envelope had been returned. He became upset, raising his voice. He demanded he be provided with the written policy for this. Staff tried to explain the procedures. His behavior continued to escalate and staff had to end the conversation because of feeling threatened by Mr. Ezike.

11/08/07:
He stated staff were all part of organized crime and were conspiring against him.

11/11/07:
Mr. Ezike exited the shower room leaving wet towels on the floor and complained about the supply of lotion provided. He called staff "niggers" and accused staff of violating his rights.

11/18/07:
Mr. Ezike dropped the contents of his lunch tray on the floor, not in the garbage can. He refused to pick it up telling staff it was their job to pick it up ("it's your job, that's what they pay you for.")

12/12/07:
Mr. Ezike stated a peer entered his room last night. He stated that if patients enter his room at night, then he will need to assume that they are going to attack him. Staff explained that this could have been an accident and the patients on the unit suffer from varying degrees of mental illness. He stated he does not believe these patients are mentally ill or need medication. He also stated staff could bring in weapons for other patients to use against him.

*Exhibit 93*

[ ]   No certificate was attached with this petition because no petition was presented to the facility director because no
      physician, qualified examiner, or clinical psychologist was immediately available or it was impossible after diligent
      effort to obtain a certificate. However:

1.   I believe, as a result of my personal observation, that the respondent is subject to involuntary admission;
2.   a diligent effort was made to obtain a certificate;
3.   no physician, qualified examiner or clinical psychologist could be found who has examined or could examine the
     respondent; and
4.   a diligent effort has been made to convince the respondent to appear voluntarily for examination by a physician,
     qualified examiner or clinical psychologist, or I reasonably believe that effort would impose a risk of harm to the
     respondent or others.

Listed below are the names and addresses of the spouse, parent, guardian, or substitute decision maker, if any, and close
relative or, if none, a friend of the respondent whom I have reason to believe may know or have any of the other names and
addresses. If names and addresses are not listed below, I made a diligent inquiry to identify and locate these individuals
and the following describes the specific steps taken by me in making this inquiry (additional page(s) may be attached as
necessary):

Mr. Ezike refused to provide information
to contact family members. There are
no prior medical records with information
on family members

Did a peace officer detain respondent, take him or her into custody, and/or transport him or her to the mental health facility?
[X] NO    [ ] YES  The peace officer may complete the petition or If the petition IS NOT COMPLETED by the peace
officer transporting the person, the following information must be entered:

       Transporting Officer's Name _____    Badge No. _____
       Employer: _____

The petitioner has made a good faith attempt to determine whether the recipient has executed a power of attorney for health
care under the Powers of Attorney for Health Care Law or a declaration for mental health treatment under the Mental Health
Treatment Preference Declaration Act and to obtain copies of these instruments if they exist."

I have read and understood this petition and affirm that the statements made by me are true to the best of my knowledge.

I further understand that knowingly making a false statement on this Petition is a Class A Misdemeanor.

Date: 12/21/07            Signed: Julie Shopnit, Scott

Time: 0835                Printed Name: JULIE SHOPNITZ

Relationship to respondent:    Address: EMHC 750 S. State St.
                                        Elgin, IL  60123

                               Phone Number: (847) 742-1040, ext 3850

Within 12 hours of admission to the facility under this status I gave the respondent a copy of this Petition (MHDD-5). I have
explained the Rights of Admittee to the respondent and have provided him or her with a copy of it. I have also provided him
or her with a copy of Rights of Individuals Receiving Mental Health and Developmental Services (MHDD-1) and explained
those rights to him or her (405 ILCS 5/3-609).

Date: 12/21/07            Signed: Julie Shopnit, Scott

Time: 0835                Printed Name: JULIE SHOPNITZ

(MHDD-5)                  Title: SOCIAL WORKER 4
IL462-2005 (R-3-04)
                         Page 3 of 5

CS 5/3-403, 3-602, 3-607, 3-610, 3-702, 3-___, 4-306, 4-402, 4-403, 4-405, 4-501, 4-6___ and 4-705

## CERTIFICATE     *Exhibit 96*

Romeo Ezike
(name)

...nally informed the above named individual of the purpose of this examination and that he or she did not have to ... to me, and that any statements made might be related in court as to the individual's clinical condition or need for ...es. Additionally, if this examination was for the purpose of determining that the above-named individual is mentally ...ed and dangerous, I informed the individual of his or her right to speak with a relative, friend or attorney before the ...nation, and of his or her right to have an attorney appointed for him or her if he or she so desired.

_____
Signature

__12·20·07__ , _____ , at __14 00__ a.m. or p.m., I personally examined the
Date)              (Year)      (Time)        (circle)

...named person. The examination was conducted at _____ E. M. H. C _____
                                                        (name of location)

...on the foregoing examination it is my opinion that he or she is a person who is:

...mentally ill and because of his or her illness is reasonably expected to inflict serious physical harm on him or herself ...r another in the near future;

...mentally ill and who because of his or her illness is unable to provide for his or her basic physical needs so as to ...uard him or herself from serious harm; or

...mentally retarded and is reasonably expected to inflict serious physical harm on him or herself or others in the near ...uture.

...my opinion on the following (include clinical observation and factual information):

Patient's charges are dismissed by Criminal Court today 12/20/07. Patient has no J & I into his illness. He is refusing to sign Voluntary. He is paranoid and agitated. Danger of harm to self and others. Refuses to take his psychiatric medications. Un cooperative with Reports of thinking & behavior while hospitalized.

...e that the person is subject to (check one): scop Re-Treatment Goals
...voluntary admission and is in need of immediate hospitalization; or
...dicial admission and is in need of immediate hospitalization.

__12·20·07__         Signature: _____

...one Number: __847-742-1060__ Printed Name: __FARZANA HUSAIN M.D__

...one)  ☑Psychiatrist   ☐ Physician   ☐ Qualified Examiner   ☐ Clinical Psychologist

...-6)
2006 (R-6-02)                           **CERTIFICATE**

Ref: ILCS 5/3-403, 3-602, 3-607 ~ 610, 3-702, 3-813, 4-306, 4-402, 4-403, 4- , 4-501, 4-611 and 4-703

## CERTIFICATE          *EXHibit 97*

Re: _Romeo Ezike_
(name)

I personally informed the above named individual of the purpose of this examination and that he or she did not have to speak to me, and that any statements made might be related in court as to the individual's clinical condition or need for services. Additionally, if this examination was for the purpose of determining that the above-named individual is mentally retarded and dangerous, I informed the individual of his or her right to speak with a relative, friend or attorney before the examination, and of his or her right to have an attorney appointed for him or her if he or she so desired.

_H. Sing MD_
Signature

On _12/21/07_ , at _09:00_ (a.m. or p.m., circle) I personally examined the
(Date)      (Year)      (Time)    (circle)

above named person. The examination was conducted at _Elgin MHC, F.T.R. G._
(name of location)

Based on the foregoing examination it is my opinion that he or she is a person who is:

[x] mentally ill and because of his or her illness is reasonably expected to inflict serious physical harm on him or herself or another in the near future;

[x] mentally ill and who because of his or her illness is unable to provide for his or her basic physical needs so as to guard him or herself from serious harm; or

[ ] mentally retarded and is reasonably expected to inflict serious physical harm on him or herself or others in the near future.

I base my opinion on the following (include clinical observation and factual information):

Mr. Ezike is a 49 yo divorced African American who was adm
to EMHC on 10/5/06 for the charge of Failure to Register
a sex offender. Recently on 12/20/07, the charges were dropped
against him. He is currently delusionally preoccupied so wrong twd
& is very unable to react and very suspicious of others. He is likely to get into
physical altercations with others. Had
physical harm to others.

I believe that the person is subject to (check one):

[x] involuntary admission and is in need of immediate hospitalization; or
[ ] judicial admission and is in need of immediate hospitalization.

Date: _12/21/07_    Signature: _H. Sing MD_

Telephone Number: _847-742-1040 x 3337_    Printed Name: _HARGURMUKH SINGH_

(check one)  [x] Psychiatrist    [ ] Physician    [ ] Qualified Examiner    [ ] Clinical Psychologist

(MHDD-6)
IL462-2006 (R-6-02)

ELGIN  MENTAL  HEALTH  CENTER
750   South State Street
Elgin, Illinois  60123-7792

INTER - OFFICE
CORRESPONDENCE

DATE:  01/07/08

FROM :   Julie Shopnitz, SW II, FTP G module, Ext. 3850

TO:    Nursing

SUBJECT :   Patient discharge

Romeo Ezike is scheduled to be discharged tomorrow: **Tuesday, 01/08/08 at 07:15.**  His criminal
charges have been dropped and he has requested to be dropped off at Cook County Jail (26th and
California.)   This has been approved.  Please see attached memo from Georgia McKinzie in Court
Services.

Please send the one week's worth of medication with him, as well as the brown envelope with his
discharge information.  He should also take his belongings with him.

Thank you

Exhibit  121

1  STATE OF ILLINOIS )
                     )  ss
2  COUNTY OF C O O K )

3          IN THE CIRCUIT COURT OF COOK COUNTY
            COUNTY DEPARTMENT — CRIMINAL DIVISION
4
   THE PEOPLE OF THE )
5  STATE OF ILLINOIS )
                     )  Case No. 05-CR-29242
6       vs.          )
                     )
7  ROMEO EZIKE       )

8              REPORT   OF   PROCEEDINGS

9          BE IT REMEMBERED that on the 12th day of

10 April, 2006, this cause came on for hearing before the

11 Honorable KENNETH WADAS, Judge of said Court, upon the

12 information herein, the defendant having entered a plea

13 of not guilty.

14      APPEARANCES:
            HON. RICHARD A. DEVINE,
15          State's Attorney of Cook County, by
            MR. PATRICK MORLEY,
16          Assistant State's Attorney,
            Appeared on behalf of the People;
17
            MR. EDWIN A. BURNETTE,
18          Public Defender of Cook County, by
            MR. RICHARD KRUSS,
19          Assistant Public Defender,
            Appeared on behalf of the Defendant.
20

21 Gwendolyn Clark
   Official Court Reporter
22 Circuit Court of Cook County
   County Department—Criminal Division.
23

24

                        1

Exhibit  38

```
 1                                        INDEX

 2    Pages: 1 through 45

 3    Date:   April 12, 2006

 4

 5    WITNESSES                    DX      CX     RDX     RCX

 6    Officer Piedra                4      10      14

 7    Officer Nolan               16      25      30      33

 8

 9    Defense Rests               33

10    State Rests                 33

11

12    ARGUMENTS

13    Mr. Kruss                   34

14    Mr. Morley                  39

15    Mr. Kruss                   42

16    Finding                     42

17

18

19

20

21

22

23

24
```

                                    2

Exhibit  39

```
 1              THE CLERK:  Romeo Ezike.

 2         MR. BUNTINAS:  This is set for motions.

 3         MR. KRUSS:  I believe we will be ready.

 4         THE COURT:  Pass the case.

 5              (Whereupon the case was passed.)

 6         THE CLERK:  Romeo Ezike.

 7         THE COURT:  Have a seat with your lawyer.

 8              We are proceeding on motion to quash arrest

 9    and suppress evidence.  Motion to exclude witnesses i

10    effect.

11              Either side wants to make an opening

12    statement?

13         MR. KRUSS:  We waive opening statement.

14         THE COURT:  Call the first witness.

15         MR. KRUSS:  Proceeding on motion to quash arrest

16    and suppress evidence, the stop.

17              Call Officer Piedra.

18                   (Witness was sworn.)

19                   OFFICER ROSURA PEDRA,

20    called as a witness on behalf of the Defense, having

21    been first duly sworn, was examined and testified as

22    follows:

23                   DIRECT EXAMINATION

24                   BY MR. KRUSS:
```

3

EX hibit 40

1        Q    Good afternoon, officer.  Please state your

2    name and spell it for the record.

3        A    Officer Rosura Pedra, R-O-S-U-R-A, P-E-D-R-A.

4        Q    Who are you employed by?

5        A    Amtrak Police Department.

6        Q    How long have you been employed by Amtrak?

7        A    Since August of last year.

8        Q    Officer, were you on duty -- did you have

9    occasion to be on duty November 28th last year about

10   8:30 in the morning?

11       A    Yes, I did.

12       Q    Around that date and at that time were you

13   working at Union Station?

14       A    Yes, I was.

15       Q    Were you in uniform that day?

16       A    Yes, I was.

17       Q    Officer, I'd like to ask you about that

18   morning about 8:30 in the morning.  Did you have

19   occasion to come into contact with a a gentleman by the

20   name of Romeo Ezike?

21       A    Yes.

22       Q    Do you see him in court today?

23       A    Yes.

24       Q    Point him out?

4

Exhibit 41

1    A    Right over there dressed in tan.

2    THE COURT:    In-court identification of the

3    defendant reflected in the record.

4    MR. KRUSS:

5    Q    Officer, what were you doing when you first

6    encountered Mr. Ezike that morning?

7    A    We were patroling the food court area, me and

8    my partner.

9    Q    Who was your partner?

10    A    Officer David Ware.

11    Q    And what was Mr. Ezike doing when you first

12    encountered him?

13    A    When we first encountered him, we were in

14    front of McDonalds.    Somebody yelled out to us and we

15    looked and it was him.

16    Q    And did you have a conversation with Mr.

17    Ezike at that time?

18    A    Yes, we did.

19    Q    And what was the nature of that conversation?

20    A    He yelled out that we were following him, and

21    we asked him what he was talking about.    Again he

22    asked -- we asked him what are you talking about.    He

23    said you are following me.    We said what are you

24    talking about.    This went back and forth.

Exhibit 42

1      Q      And did you have an occasion to arrest Mr.

2    Ezike at that time?

3      A      No, I didn't.

4      Q      How long were you present with Mr. Ezike that

5    morning?

6      A      Roughly 10 minutes, 15 minutes.

7      Q      After that 10 or 15 minutes, what happened?

8      A      We let him go.  We ran a name check.  This

9    guy was yelling at us saying we were following him.  He

10   said was going to be in the McDonalds and drinking his

11   coffee and staying in the food court.  So I later him

12   asked him if he would be traveling by Amtrak or Metra.

13   He started yelling he wasn't going to be traveling at

14   all.  He was going to stay in the food court and he was

15   going to drink his coffee and not be put out.

16             At that point I asked him for ID.  I got the

17   ID.  I called Officer Nolan on the side band to name

18   check it.

19     Q      When you got Mr. Ezike's identification, did

20   you learn where he resided?

21     A      At that point, no.

22     Q      Now, officer, you filled out a report

23   regarding your incident with Mr. Ezike?

24     A      Yes, I did.

Exhibit 43

1      Q      And in that report did you have occasion to

2    record the address where Mr. Ezike was living?

3      A      The address I recorded was on the license he

4    had given me.

5      Q      Do you recall what that address was?

6      A      It was out of state.

7      Q      Do you recall what state it was in?

8      A      I believe it was Washington, but I can't be

9    sure.

10     Q      Do you recall what the actual address was?

11     A      The actual address itself, no.

12     Q      Is there anything that would refresh your

13   memory what the address was?

14     MR. MORLEY:  Objection.

15     THE COURT:  Overruled.

16     THE WITNESS:  No.  If I looked at the report I

17   guess.

18     MR. KRUSS:  May I approach the witness?

19     Q      Show the officer what I'm identifying as

20   Defense Exhibit No. 1.  Do you recognize this?

21     A      Yes, I do.

22     Q      What's that document?

23     A      It's the report I wrote.

24     Q      And it's regarding your encounter with Mr.

7

Exhibit 44

1  Ezike?

2      A    Yes.

3      Q    Look at the section where Mr. Ezike's address

4  is.   Is your memory now refreshed?

5      A    What I wrote?

6      Q    Do you recall what his address is?

7      A    Seattle, Washington was the state.

8      Q    After your encounter with Mr. Ezike was over,

9  did you not arrest him?

10      A    No, I did not.

11      Q    What did Mr. Ezike do after your encounter

12  was over?

13      A    During the encounter he asked to see a

14  supervisor; so I called my sergeant.   My sergeant came

15  up.

16      Q    Was was the name of your sergeant?

17      A    Sergeant Blondon.

18      Q    And Sergeant Blondon approached?

19      A    Yes.

20      Q    When Sergeant Blondon approached, who was

21  present?

22      A    It was myself, Officer Ware and the

23  defendant.

24      Q    What happened -- how long did it take

Exhibit 45

```
 1   Sergeant Blondon to arrive at the food court?

 2        A     2 or 3 minutes, not very long.

 3        Q     When Sergeant Blondon arrived, what happened?

 4        A     He was still yelling at us.  He was still

 5   going back and forth with us, and she approached him

 6   and she verbally warned him about his disorderly

 7   conduct.  At this point people were starting to gather

 8   around.

 9        Q     Did Sergeant Blondon place Mr. Ezike under

10   arrest at that time?

11        A     No, she did not.

12        Q     What was the outcome when Sergeant Blondon

13   approached, what was the outcome?

14        A     He wanted to place a complaint against myself

15   and my partner.  She told him she would be more than

16   happy to take his statement.  She told him he could

17   finish his coffee, and he said he would, and she gave

18   him directions to our office downstairs in the old

19   building.

20        Q     Now after Sergeant Blondon gave Mr. Ezike the

21   directions, what did you do?

22        ·A     He was clear.  My partner called me back and

23   let me know he was clear from NCIC and Leads of any

24   warrants and that's it, just let him go.
```

9

Exhibit 46

1        Q      And was that the end of your encounter with

2    Mr. Ezike at that point?

3        A      Yes, it was.

4        MR. KRUSS:   Thank you.   Nothing further.

5        THE COURT:   Cross-examination.

6               CROSS-EXAMINATION

7               BY MR. MORLEY:

8        Q      Officer Piedra, on the 28th of November,

9    2005, were you working at 210 South Canal?

10       A      Yes, I was.

11       Q      That's Union Station?

12       A      Yes, it is.

13       Q      At 8:30 in the morning what's going on at

14   Union Station?

15       A      It's rush hour, it's crowded with people

16   everywhere.

17       Q      This morning it was pretty crowded on that

18   day?

19       A      Yes, it was.

20       Q      And you were working with Officer Ware?

21       A      Yes, I was.

22       Q      And your normal foot patrol duties?

23       A      Yes.

24       Q      And you were in the area near the food co

Exhibit 47

1    A    We were patroling the food court.  We walked

2    around.  We were actually standing by the McDonalds

3    watching the crowd go by.

4    Q    The defendant came up to you and started

5    accusing you of following him, is that correct?

6    A    The defendant began yelling from inside the

7    McDonalds and it caught our attention.

8    Q    You weren't following him?

9    A    No.

10    Q    You were on your normal patrol?

11    A    Yes.

12    Q    You had seen the defendant before, correct?

13    A    Yes, I have.

14    Q    And you had never had any face-to-face

15    contact with him?

16    A    No reason to, no.

17    Q    You had seen him for a couple of weeks?

18    A    I seen him for a couple of weeks on several

19    occasions.

20    Q    At least 5 occasions?

21    A    Yes.

22    MR. KRUSS:  Objection.  This is beyond the scope

23    of the direct.

24    THE COURT:  Overruled.

11

Exhibit 48

MR. MORLEY:

Q    And this was your first conversation with him?

A    Yes.

Q    And he was yelling at you that you were following him?

A    Yes.

Q    And at this time you had been with the Amtr police for about 3 months?

A    About 4 months, yes.

Q    And he was attracting a crowd?

A    Yes, he was.

Q    And he indicated to you that he was not traveling with Amtrak or Metra?

A    Yes.

Q    And those are the two trains that run out of Union Station?

A    Yes, they are.

Q    Now you asked him for an ID?

A    Yes, I did.

Q    He gave you an ID?

A    Yes, he gave me an ID.

Q    He also asked to speak to your supervisor?

A    Yes, he did.

Exhibit 49

1      Q      And you summoned your supervisor?

2      A      Yes, I did.

3      Q      And Sergeant Blondon came to that location?

4      A      Yes, she did.

5      Q      And it only took about 5 minutes?

6      A      Roughly.

7      Q      And she warned him of his disorderly conduct

8  because he was yelling and attracting a crowd?

9      A      Yes, and she explained to him that we weren't

10  following him.  We were just on our regular patrol.

11      Q      She said your job?

12      A      Yes.

13      Q      Defendant expressed an interest in filing a

14  complaint against you and your partner?

15      A      Yes, he did.

16      Q      Sergeant Blondon told him how to file a

17  complaint against you and your partner?

18      A      Yes, she did.

19      Q      She told him where the police station was?

20      A      Yes, she did.

21      Q      And he told her leave me alone, I just want

22  to finish my coffee?

23      A      No, he said would be finishing his coffee,

24  but he would be down to file a complaint later.

13

*Exhibit 50*

1    Q    And you left him to drink his coffee?

2    A    Yes, I did.

3    Q    He wasn't placed into custody?

4    A    He was not placed into custody.

5    Q    You did do a report in this incident?

6    A    Yes.

7    Q    And that was on a disorderly conduct?

8    A    Yes, it was.

9    Q    Is that normal procedure when you have an

10   encounter with a person at the Amtrak police station?

11   A    Yes, it is.

12   Q    And you at that time you just had his ID

13   address, is that correct?

14   A    That's right.

15   Q    And you didn't deal with any subsequent

16   arrests for any other offenses?

17   A    No.

18   MR. MORLEY:  Nothing further.

19   MR. KRUSS:  Brief redirect.

20   THE COURT:  Redirect.

21                  REDIRECT EXAMINATION

22                  BY MR. KRUSS:

23   Q    Officer, you indicated this wasn't the first

24   time you had seen Mr. Ezike, is that correct?

14

Exhibit 51

1     A    That's correct.

2     Q    You believe you said you had seen him on a

3 prior occasion, is that correct?

4     A    At least.

5     Q    How far along a period of time were those

6 occasions?

7     A    I'd say from that encounter, two weeks before

8 I had seen him.

9     Q    On any of those prior occasions did Mr. Ezike

10 yell at you?

11     A    No, he did not.

12     Q    On any of those prior occasions was he doing

13 anything that was illegal?

14     A    No.

15    MR. KRUSS:  Thank you.  Nothing further.

16    THE COURT:  Recross.

17    MR. MORLEY:  No, sir.

18    THE COURT:  You can step down, officer.  Thank

19 you.

20          (Witness was excused.)

21    MR. KRUSS:  At this time the defense calls Officer

22 Nolan.

23          (Witness was sworn.)

24

Exhibit 52

```
1                    OFFICER BRIAN NOLAN,

2    called as a witness on behalf of the Defense, having

3    been first duly sworn, was examined and testified as

4    follows:

5                    DIRECT EXAMINATION

6                    BY MR. KRUSS:

7         Q    Good afternoon, officer.  State your name and

8    spell it for the record.

9         A    Officer Brian Nolan, N-O-L-A-N.

10        Q    Officer, whom are you employed by?

11        A    The Amtrak police department.

12        Q    How long have you been employed by the Amtrak

13   police?

14        A    5 years.

15        Q    Were you on duty on November 28th of last

16   year?

17        A    I was.

18        Q    And was that around 9:30 in the morning?

19        A    It was.

20        Q    And at around 9:30 in the morning on November

21   28th where were you -- where were you on duty at?

22        A    Union Station in Chicago.

23        Q    Where is that located?

24        A    210 South Canal Street.
```

16

Exhibit 53

1      Q      Around 9:30 that morning did you have

2   occasion to come into contact with a gentleman by the

3   name of Romeo Ezike?

4      A      Yes.

5      Q      Do you see him in court today?

6      A      Yes.

7      Q      Point him out and identify an article of

8   clothing he's wearing?

9      A      Defendant sitting on the right side of the

10  courtroom with tan DOC jump suit.

11     THE COURT:  The officer identified the defendant

12  in open court.

13     MR. KRUSS:

14     Q      Officer, how is it you came into contact with

15  Mr. Ezike that morning?

16     A      I had run a criminal history check.  After I

17  ran a warrant check on him which revealed he was a

18  registered sex offender.

19     Q      How was it you came to run a check on Mr.

20  Ezike?

21     A      I was asked to run a criminal sheet from

22  Officer Piedra who had him stopped.

23     Q      What do you do when you run a criminal

24  history?

17

Exhibit 54

1      A     Type it into the computer and it sends out to

2   the FBI records.

3      Q     Does it look for warrants or does it look for

4   something else?

5      A     It looks for warrants, criminal history,

6   traffic offenses.

7      Q     You said you put Ezike's name into the

8   system?

9      A     Yes.

10     Q     Did you put any other identifiers besides his

11  name?

12     A     His state identification number, his SID

13  number out of California.

14     Q     What is that state identification number?

15     A     It's a number that's issued to a person

16  that's arrested by any particular state.  It gets sent

17  to the FBI national records.

18     Q     How is it you had that information for Mr.

19  Ezike?

20     A     From the criminal history I had run.

21     Q     Well, I guess I'm not following you.  How --

22  what prompted you to get the state identification

23  number from Mr. Ezike so you could find out the other

24  information?

18

Exhibit 55

1    A    That comes with the criminal history check.

2    Q    Well, when you do the criminal history check,

3 what information do you need?

4    A    Name, date of birth, and if you have a social

5 security number, you can use that, too.

6    Q    How was it you obtained this information

7 regarding Mr. Ezike?

8    A    From Officer Piedra.

9    Q    And when did Officer Piedra give you this

10 information?

11    A    When she had him stopped up at McDonalds.

12    Q    Do you recall what time it was you received

13 the information from Officer Piedra?

14    A    Roughly 8:30, 9:00 o'clock, somewhere in that

15 area.

16    Q    It was roughly about an hour before you

17 encountered Mr. Ezike yourself?

18    A    Correct.    $\ell\dot{\iota}\mathcal{E}$

19    Q    Now you said you ran the criminal information

20 on Mr. Ezike?

21    A    Yes.

22    Q    What did that -- what, if anything, was

23 revealed when you ran that information?

24    A    The information on the criminal history out

19

Exhibit 56

1   of California was that Mr. Ezike was a registered sex

2   offender.

3          Q    Registered sex offender in what state?

4          A    In the State of California.

5          Q    And did it show anything else?

6          A    Out of California, no.

7          Q    Were there any active warrants for Mr. Ezike?

8          A    No.

9          Q    How exactly did you come into contact with

10  Mr. Ezike at 9:30 in the morning?

11         A    Mr. Ezike came into the office to file a

12  complaint against Officers Piedra and Ware.

13         Q    And when he came to the office did you have

14  occasion to have a conversation with him?

15         A    I did.

16         Q    What was the nature of the conversation?

17         A    The nature of the conversation was to

18  basically ascertain an address of where he had been

19  staying.

20         Q    Now when you say address of where he had been

21  staying, did you ask him whether he was -- where he was

22  residing?

23         A    He was not providing an address with Sergeant

24  Blondon for the complaint for any type of further

20

Exhibit 57

1  follow-up and so he had said he was homeless; so I

2  asked him if he had stayed in any shelters in the

3  Chicagoland area and he said many.

4        I asked him if he had stayed at the Pacific

5  Garden Mission and he said yes.  I asked for how long.

6  He said a couple will of weeks.  I said what's a couple

7  of weeks.  He said 3 to 4 weeks.

8     Q    Let's backtrack.

9          Were you aware Officer Piedra had learned he

10 had an identification card -- he had given Officer

11 Piedra an identification card?

12    A    I don't recall.  She just gives it to me by

13 name, date of birth.

14    Q    Officer Piedra never gave you name, address

15 information for Mr. Ezike?

16    A    No.

17    Q    When Mr. Ezike came into your office, was he

18 under arrest at that time?

19    A    No.

20    Q    When you had this conversation with Mr.

21 Ezike, was he under arrest?

22    A    No.

23    Q    After this conversation with Mr. Ezike, what

24 did you do?

Exhibit 58

1    A    Which part of the conversation?

2    Q    Well, you said you had said you asked him if

3    he had stayed at the Pacific Gardens Mission, is that

4    correct?

5    A    Correct.

6    Q    What was his response to that question?

7    A    That he had stayed there, and I asked for how

8    long.  He said a couple of weeks and I said what is a

9    couple of weeks.  He said 3 to 4.

10    Q    After he said that, what did you do?

11    A    He was then placed under arrest for failing

12    to register as a sex offender in the State of Illinois.

13    Q    Now after you placed Mr. Ezike under arrest,

14    did you read him his rights?

15    A    He had already been read his rights.

16    Q    Who did that?

17    A    I did.

18    Q    At what point did you read him his rights?

19    A    Basically when I went out to try to establish

20    his residency in Illinois.

21    Q    So before -- let me make sure I understand

22    this.  You said you placed him under arrest after a

23    conversation with him?

24    A    Correct.

22

Exhibit 59

1     Q     Did you read him his rights before you placed

2     him under arrest or after you placed him under arrest?

3     A     Before I started to talk to him before I

4     placed him under arrest.

5     Q     So before you had any conversation with him,

6     you had read him his rights?

7     A     Correct.

8     Q     After he was arrested, after you formally

9     placed Mr. Ezike under arrest, did you attempt to have

10    a conversation with him?

11    A     Later, a couple of hours later I did after I

12    obtained his sex offender registry cards in the State

13    of California.

14    Q     And was any -- after this couple of hours

15    later, did you attempt to actually -- let me rephrase

16    the question.

17          Do you recall about what time it was you

18    attempted to have this conversation with him following

19    his arrest?

20    A     That I don't.

21    Q     Did Mr. Ezike actually speak to you this

22    couple of hours after he was arrested?

23    A     Yes.

24    Q     Was anyone else present when you had the

23

Exhibit 60

1    conversation with Mr. Ezike?

2         A    I believe Sergeant Blondon might have been

3    outside of the room in the sergeant's office which is

4    directly across from the detention area.

5         Q    You said Sergeant Blondon was outside the

6    room?

7         A    Correct.

8         Q    Was she able to hear any conversation you

9    had?

10        A    Yes, she would have been able to.

11        Q    Did Mr. Ezike make any statements to you at

12   that time?

13        A    Yes, he did.

14        Q    And is it your belief those statements maybe

15   used against Mr. Ezike at trial?

16        A    I can't answer that.  I don't know.

17        Q    Well, is it your belief that in the

18   conversation you had with Mr. Ezike a couple of hours

19   after his arrest -- did he make any statements as to

20   where he was living?

21        A    No.

22        MR. KRUSS:  Thank you.  I have nothing further.

23        THE COURT:  Cross.

24

Exhibit 61

```
 1                  CROSS-EXAMINATION

 2             BY MR. MORLEY:

 3        Q    Officer Nolan, on the 28th of November last

 4   year sometime between 8:30 and 9:00 o'clock, you were

 5   on foot patrol in the Union Station area, is that

 6   corrects?

 7        A    That's correct.

 8        Q    And you received a radio transmission from

 9   one of your fellow officers?

10        A    Correct.

11        Q    It was Officer Piedra?

12        A    Correct.

13        Q    And she asked you to do a name check on

14   someone?

15        A    That's correct.

16        Q    And you are not able to do a name check out

17   in the field, is that correct?

18        A    Correct.

19        Q    You would go to the Amtrak police station?

20        A    Correct.

21        Q    So based on what Officer Piedra asked you to

22   do, you relocated into the Amtrak police station?

23        A    That's correct.

24        Q    You ran the defendant's name on the computer?
```

25

Exhibit 62

```
 1        A      Correct.

 2        Q      And you learned that the defendant didn't

 3   have any warrants?

 4        A      Correct.

 5        Q      Now you stayed in the Amtrak police station?

 6        A      Yes.

 7        Q      And sometime later your sergeant came in?

 8        A      Yes.

 9        Q      Officer Blondon?

10        A      Yes.

11        Q      And prior to Sergeant Blondon coming in, you

12   learned that the defendant was a sex offender,

13   convicted sex offender registered in California?

14        A      That's correct.

15        Q      He wasn't registered in Illinois?

16        A      Correct, I did not get a registration

17   response out of Illinois.

18        Q      And you learned that the defendant was

19   required to register wherever he lived for life?

20        A      Yes, upon contact to California, yes.

21        Q      When Sergeant Blondon got in, you had a

22   conversation with her?

23        A      Yes.

24        Q      And you learned that the defendant was coming
```

26

*Exhibit 63*

1    in to file a complaint?

2        A    Yes.

3        Q    And Sergeant Blondon would handle the

4    complaint aspect?

5        A    That's correct.

6        Q    And you saw the defendant come into file a

7    complaint?

8        A    I did.

9        Q    And the defendant was -- defendant initiates

10   a complaint against these officers, is that correct?

11       A    He did.

12       Q    But he wasn't providing Sergeant Blondon with

13   an address?

14       A    Correct.

15       Q    But he did provide Sergeant Blondon with a

16   post office box?

17       A    Yes, later on.

18       MR. KRUSS:  Objection.  This goes beyond the

19   scope, Judge.

20       THE COURT:  Overruled.

21       MR. MORLEY:

22       Q    Are you required to provide an address when

23   you file a complaint against someone, is that correct?

24       A    That's correct, for follow-up investigation.

Exhibit 64

1      Q      That's in case someone needs to contact them

2  on whatever occurred?

3      A      Correct.

4      Q      Now when you talked to the defendant, you

5  read him his rights?

6      A      I did.

7      Q      And you asked -- and you were trying to

8  determine how long he had been in Chicago?

9      A      Correct.

10     Q      And you were trying to determine if he had

11 been in Chicago for over ten days?

12     A      Correct.

13     Q      Because if he's been in Chicago over ten

14 days, you are required to register in the State of

15 Illinois if you are permanently living here?

16     A      That's correct.

17     Q      The defendant indicated he was homeless?

18     A      Correct.

19     Q      And you asked him where -- you asked him

20 where he had stayed?

21     A      Correct, I asked him if he stayed in homeless

22 shelters.

23     Q      And he told you he had stayed in specifically

24 homeless shelters or numerous homeless shelters?

28

Exhibit 65

1        A    Yes.

2        Q    You asked him if he had stayed at Pacific

3   Gardens Mission?

4        A    Yes.

5        Q    That's on State Street in Chicago?

6        A    Yes.

7        Q    And it's not that far from Union Station, is

8   that correct?

9        A    Roughly bearly a mile.

10       Q    So a lot of people that are homeless in that

11  area might stay at Pacific Gardens Mission?

12       A    They do.

13       Q    He indicated he had stayed at Pacific Garden

14  Mission?

15       A    Yes.

16       Q    When you tried to find out how long, he told

17  you approximately 3 to 4 months?

18       A    He stayed a couple of weeks and, I said what

19  is a couple of weeks, and he said 3 to 4.

20       Q    The defendant also told you he had an

21  argument with the State of California because people

22  were chasing him and that's why he left California, is

23  that correct?

24       A    That they were out to get him, yes.

29

Exhibit 66

1     Q    After you established the defendant had been
2   staying here for over 10 days, it's at that point he
3   was placed in custody?
4     A    Correct.
5     Q    And you learned that the defendant had a post
6   office box in Chicago, is that correct?
7     A    Correct.
8     Q    And that's post office box 803513 in Chicago,
9   Illinois?
10    A    I would have to refer to my records.
11    Q    But it was in Chicago?
12    A    It was a Chicago, P.O. Box, yes, it was.
13    Q    And that's the address he provided you with?
14    A    Correct.
15    MR. MORLEY:  Nothing further.
16    THE COURT:  Redirect?
17    MR. KRUSS:  Judge, I have some redirect.  We'd
18  like to ask a couple of questions regarding
19  specifically the statement for purposes of the motion
20  to suppress statements.
21    THE COURT:  Okay.
22              REDIRECT EXAMINATION
23              BY MR. KRUSS:
24    Q    Officer, Mr. Ezike came downstairs, you said

Exhibit 67

1    he was not under arrest, is that correct?

2         A    That's correct.

3         Q    How long have you been a Metra police

4    officer?

5         A    I'm an Amtrak police officer for 5 years.

6         Q    I'm sorry.  You said that before you placed

7    Mr. Ezike under arrest, you read him his rights, is

8    that correct?

9         A    That's correct.

10        Q    Is that your standard practice of reading

11   someone their rights before placing them under arrest?

12        A    If I'm trying to ascertain information that

13   may lead to arrest, it's general practice, yes.

14        Q    Now was Mr. Ezike at the moment you read Mr.

15   Ezike his rights, was he free to leave?

16        A    Yes.

17        Q    Now after you placed him under arrest, you

18   said that you learned some information about a post

19   office box, is that correct?

20        A    Correct.

21        Q    And you didn't know that information before

22   you placed him under arrest, is that correct?

23        A    He had given Sergeant Blondon the post office

24   box after she had tried -- after both of us had tried

31

Exhibit 68

1  to explain to him they need an address to put down in

2  order to send some type of correspondence for follow-up

3  investigation.

4      Q    But at the time that you actually placed him

5  under arrest, did you know specifically where Mr. Ezike

6  was residing?

7      A    I knew he lived in Chicago.

8      Q    But you did not know where he was actually

9  residing at the time you placed him under arrest?

10     A    Where exactly, not exactly, no.

11     Q    Now in terms of you testified that Mr. Ezike

12  made some statements to you, did you ever take these

13  statements down in a written form?

14     A    From him, no.

15     Q    Did you ever have Mr. Ezike sign anything?

16     A    No.

17     Q    Now you had the opportunity to, if you

18  wished, to take this statement in writing, is that

19  correct?

20     A    The statement that I had obtained from him it

21  was basically just a yes-or-no response I was looking

22  for.

23     Q    But you could have taken a written statement

24  if you wished to, is that correct?

32

Exhibit 69

1        A    If I wished to.

2    MR. KRUSS:  Thank you.  I have nothing further.

3    THE COURT:  Recross?

4                RECROSS-EXAMINATION

5            BY MR. MORLEY:

6        Q    Officer Nolan, before you placed the

7    defendant under arrest, he told you that he was

8    homeless, is that correct?

9        A    Correct.

10       Q    He told you he had been staying here for

11   approximately 3 to 4 weeks?

12       A    That he had stayed in the Pacific Garden

13   administration for 3 or 4 weeks, yes.

14       Q    And he told you he had been living in several

15   homeless shelters?

16       A    Correct.

17   MR. MORLEY:  Nothing further.

18   MR. KRUSS:  Nothing based upon that.

19   THE COURT:  Officer, you can step down.  Thank you

20   very much.

21            (Witness was excused.)

22   MR. KRUSS:  At this time defense rests.

23   MR. MORLEY:  State rests.

24   THE COURT:  Arguments.

Exhibit 70

1    MR. KRUSS:  Judge, would you prefer to argue both

2  motions at the same time?

3    THE COURT:  If you want, there's no written motion

4  to suppress.

5    MR. KRUSS:  Actually there was a written motion to

6  suppress statement.

7    THE COURT:  There's no written statement.  It's

8  like an oral admission or something like that.  I

9  assume as to where he lived or something like that.

10    MR. KRUSS:  Judge, you heard two officers testify

11  today, Officer Piedra as well as Officer Nolan, and

12  Officer Piedra testified that she encountered Mr. Ezike

13  in the morning of November 28, '05 about 8:30 in the

14  morning at Union Station; that Mr. Ezike was supposedly

15  yelling at officer Piedra.

16        In fact Mr. Ezike was being threatened with

17  being charged with disorderly conduct, but at the end

18  of their encounter, Mr. Ezike remained in the Union

19  Station food court and approximately an hour later

20  encountered Officer Nolan in the Amtrak police office.

21        Now when Mr. Ezike spoke with Officer Piedra,

22  Officer Piedra told you Mr. Ezike gave his

23  identification card and showed his address as being in

24  Seattle, Washington.  That was the extent of the

Exhibit 71

1   information that Officer Piedra had.

2           Apparently according to Officer Nolan,

3   Officer Piedra called him and gave him some information

4   on Mr. Ezike, and Officer Nolan had looked him up on

5   the computer system, and as a result of that there was

6   no active warrant out for Mr. Ezike.

7           It showed that Mr. Ezike was a registered sex

8   offender in the State of California.  There is no

9   further information regarding Mr. Ezike.  As I said no

10  active warrant for Mr. Ezike.

11          About an hour after the initial encounter by

12  Officer Piedra, Mr. Ezike goes to the Amtrak police

13  office and speaks to Officer Nolan.

14          It's interesting the first thing Officer

15  Nolan does is to, according to his testimony, he reads

16  Mr. Ezike his rights.  All Officer Nolan knows about

17  Mr. Ezike there's no active warrant for him.  Note

18          He wasn't being arrested for anything because

19  Officer Piedra let's him go and he has to register as a

20  sex offender in California.  That's the extent of the

21  information Officer Nolan has about Mr. Ezike.

22  However, at that point Officer Nolan reads Mr. Ezike

23  his rights.  Officer Nolan testified Mr. Ezike would

24  have been free to leave at that point.

35

Exhibit 72

1    I contend to you that's ludicrous.  At the

2  moment that Officer Nolan read Mr. Ezike his rights,

3  Mr. Ezike was placed under arrest by the officer.

4    The first issue is whether it was probable

5  cause to make that arrest, and I contend there is not.

6  Again Mr. Ezike was not arrested for the encounter with

7  Officer Piedra.  He was simply let go with a warning.

8  That slim warning causing a disturbance didn't rise to

9  somebody would be arrested for.  He didn't have any

10  active warrant and he was a registered sex offender in

11  California.

12    Plus there was no evidence whatsoever at that

13  point that Mr. Ezike actually resided in Illinois.  Mr.

14  Ezike had given an identification to Officer Piedra

15  that said Seattle Washington.  Officer Nolan hadn't

16  spoken to Mr. Ezike at the point he read him his

17  rights, there would be no way for the officer to know

18  anything about residing in Pacific Gardens or homesless

19  or any of that information.  The officer knew nothing

20  about that at the time he read his rights to Mr.

21  Ezike.

22    I believe at best the officer was acting on a

23  hunch when he read Mr. Ezike his rights.  He may have

24  suspected there was something going on.  Certainly it

36

Exhibit  73

1 | was not probable cause.

2 |       Again there was nothing explicit like an

3 | outstanding warrant to indicate yes, this guy needs to

4 | be held.  There was no such thing in regards to Mr.

5 | Ezike.

6 |       In any event though, Officer Nolan has a

7 | conversation with Mr. Ezike, and after reading him his

8 | rights and everything, this conversation was never

9 | taken down in writing.  It's oral.

10 |       Mr. Ezike never signed anything and Sergeant

11 | Blondon may or may not have been present for this

12 | conversation at some point, but the bottom line is that

13 | Officer Nolan speaks to Mr. Ezike and Mr. Ezike tells

14 | him he's homeless and he had been living at Pacific

15 | Gardens Mission and he had been there a couple of

16 | weeks.  He hadn't stayed there and he had been at other

17 | shelters in the area.

18 |       Let's assume everything the officer says is

19 | true, that everything Mr. Ezike supposedly told him is

20 | in fact correct, well, he doesn't have -- if what the

21 | officer is saying is true, Mr. Ezike tells him he's

22 | homeless.

23 |       He doesn't have place to live.  If he doesn't

24 | have a place to live, it's quite difficult to have an

*Exhibit 74*

1  had the opportunity to take these statements in

2  writing.  He did not do so.

3       Mr. Ezike did not sign any waiver whatsoever

4  about his right to remain silent, and all we have is

5  the officer saying yes, he told me these things.

6       For those reasons I ask the court to first

7  grant the motion to quash the arrest and suppress

8  evidence.  Failing that, I ask the court grant the

9  motion to suppress statements.

10      THE COURT:  State.

11      MR. MORLEY:  Your Honor, we ask you to deny both

12 of the defendant's motions.  There's no evidence here

13 that the officers were anything but absolutely

14 respectful of both the defendant's 4th Amendment right

15 concerning his seizure and the 5th Amendment right

16 concerning the incriminating statements he made on

17 himself.  There really wasn't even a seizure for 4th

18 Amendment purposes until the defendant actually made

19 the incriminating statements, at which time he was

20 placed under arrest.

21      For whatever reason the defendant decided to

22 initiate contact with the police in this case when he

23 approached them outside of the McDonalds and said you

24 are following me.  And did despite the fact that the

39

$E \times h i b i t \ 76$

1   defendant was loud and accusatory and being disorderly

2   at rush hour in Union Station, these police officers

3   let him go and provided him with information on how you

4   go about filing a complaint against the Amtrak police.

5          The officer did run the name to make sure

6   that there was -- there were no warrants, and Officer

7   Nolan took the additional step of who -- let's find out

8   a little bit about this person that we're dealing with,

9   and he found out the defendant was a registered sex

10  offender.

11         We would agree at that he point there isn't

12  any probable cause to arrest the defendant.  However,

13  because he's in Illinois, he had already indicated he's

14  not traveling and as he's in the station, there's more

15  than enough reasonable suspicion to stop him.

16  Regardless of that, he was free to leave as the officer

17  indicated.  He didn't want to leave.  He wanted -- he

18  came into the station to file a complaint against the

19  police officers.  He was free to leave, but he didn't

20  want to leave.

21         At that point as the officers are talking to

22  him, he's aware this guy is a registered sex offender.

23  He's supposed to be registered if he's in Illinois.

24  He's aware while the defendant is not under arrest, he

the

the

plea

40

Exhibit 77

1    was asking him questions that were designed to elicit

2    an incriminating response.  It wasn't until after the

3    rights were given and the incriminating response was

4    given by the defendant to the officer that he was then

5    placed under arrest.

6         And it's not really an issue for the motion,

7    but in terms of how difficult it is to register as a

8    sex offender if you don't have a home, the defendant is

9    required to register as a sex offender.  The officer

10   pulled up that information.  He's required to register

11   for life.  He indicated to the officer I have been here

12   3 or 4 weeks.  That's over 10 days.  If he's here, he's

13   supposed to register.

14        In fact the area of Pacific Garden Mission,

15   that's Beat 132, they have more registered sex

16   offenders than any other beat in the City.

17        MR. KRUSS:  Objection.  Beyond the scope.

18        THE COURT:  Sustained.

19        MR. MORLEY:  The defendant is required to register

20   as a sex offender.  When he said I have been here for 3

21   to 4 weeks, that's more than probable cause to arrest

22   him, and we ask you deny the defendant's motion to

23   suppress the arrest and to suppress -- quash his arrest

24   and suppress his statement.

41

*Exhibit 78*

1    THE COURT:   Rebuttal.

2    MR. KRUSS:   Just very briefly, Judge.

3         There is still some question even if you

4    believe what Officer Nolan said, that it was very vague

5    as to where Mr. Ezike was in Illinois and how long he

6    had actually been here.   It's unclear as to whether

7    there was actually a violation of the law because it's

8    unclear as to how long Mr. Ezike was actually here.

9    It's unclear as to where he was supposedly staying.

10        Again if you take Officer Nolan's words at

11   face value, I don't believe that rises to probable

12   cause to arrest Mr. Ezike for failure to register as a

13   sex offender.

14        Thank you.

15   THE COURT:   I always like to look at the

16   historical perspective.   Where are we in time in

17   America right now.   Do we all know, every single

18   American know that terroists bomb transportation

19   centers; that's why people like the Amtrak police are

20   there with a heightened awareness to patrol areas.

21        They have a right to be there.   I'm glad they

22   are there.   They are looking around and they are

23   looking around for anybody suspicious.   They didn't

24   have to look too hard because the defendant drew

42

*Exhibit .79*

1  suspicion to himself.  He called attention to himself.

2          Inspite of all of that, inspite of all his

3  assertions out there, the police didn't arrest him.

4  They said fine, finish your coffee.  If you want to

5  file a complaint, there is the office, go file a

6  complaint.  A requirement for filing a complaint is

7  giving your address and all he gave was a post office

8  box.

9          Both of the officers were highly credible,

10 doing their job, not looking for trouble, not harassing

11 the defendant, and basically the defendant walks into a

12 police station to file a complaint.  He brought the

13 heat on himself, and then when they asked him, they

14 even give him his rights before they ask him any

15 questions, something that's never done by the police.

16 So Amtrak was like overly professional, overly

17 courteous, overly respectful, highly professional in

18 their dealings with the defendant.

19          There's not one legal basis to quash his

20 arrest.  So the only thing to suppress of the arrest

21 would be his oral statement and there's no basis to

22 suppress that statement.  The interrogation was against

23 the response of him coming in complaining.  He brought

24 the heat on himself.

43

Exhibit 80

1          Motion to quash an arrest and suppress

2    evidence denied.  Motion to suppress statement denied.

3        MR. KRUSS:  We would like to set the matter down

4    for a jury trial.  I have spoken with the state.  Looks

5    like May 15th.  There are a couple of matters already

6    set we'd like to set this May 15th for a jury trial and

7    go by agreement to that date.

8        THE COURT:  By agreement 5/15/06 with subpoenas

9    for trial.  Jury indicated civilian clothes.

10

11              (A continuance was taken to 5/15/06.)

12

13                                                          the

14                                                          the

15                                                          plea

16

17

18

19

20

21

22

23

24

44

Exhibit 81

1   STATE OF ILLINOIS )

                     )   SS.

2   COUNTY OF C O O K )

3       THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
      COUNTY DEPARTMENT    -    CRIMINAL DIVISION

4

5         I, Gwendolyn Clark, Official

  Shorthand Reporter of the Circuit Court of Cook

6   County Department—Criminal Division do hereby

7   certify that I reported in shorthand the

8   proceedings had at the hearing in the

9   above-entitled cause; and that I thereafter

10   caused to be transcribed into typewriting the

11   foregoing transcript, which I certify is a

12   true and correct transcript of said

13   proceedings.

14

15

16   Official Shorthand Reporter
  Circuit Court of Cook County.

17

18

19

20

21

22

23

24

45

*Exhibit 82*